2012 WY 87

**Bryan Ellis PHELPS, Appellant (Defendant),**

**v.**

**The STATE of Wyoming, Appellee (Plaintiff).**

**Justin Lindale Fitch, Appellant (Defendant),**

**v.**

**The State of Wyoming, Appellee (Plaintiff).**

Nos. S–11–0215, S–11–0216.

Supreme Court of Wyoming.

June 19, 2012.

Representing Appellants: Dion J. Custis of Dion J. Custis, PC, Cheyenne, Wyoming.

Representing Appellee: Gregory A. Phillips, Attorney General; David L. Delicath, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Justin A. Daraie, Assistant Attorney General. Argument by Mr. Daraie.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

KITE, Chief Justice.

[¶ 1] A Wyoming Highway Patrol trooper stopped Bryan Ellis Phelps and Justin Lindale Fitch for a traffic violation, detained them, conducted a drug dog sniff of their vehicle and, after the dog alerted to the presence of controlled substances, searched the vehicle and found marijuana. Messrs. Phelps and Fitch were each charged with three felonies. They moved to suppress the evidence seized during the search and the district court denied the motion. They subsequently entered pleas of guilty to one of the counts, while reserving their right to appeal the denial of their suppression motion. On appeal, they challenge that denial as well as the district court's denial of a discovery motion. We affirm.

## ISSUES

[¶ 2] Messrs. Phelps and Fitch present the following issues for our consideration:

I. Was there reasonable cause to stop the vehicle?

II. Did the traffic stop exceed the scope of an investigatory detention?

III. Was the dog's alert sufficient to establish probable cause for a search of the vehicle?

IV. Did the district court abuse its discretion and commit reversible error by denying the Appellants' motions to discover [1] and to suppress?

The State asserts the initial stop was justified, the initial questioning was reasonably related to the stop, reasonable suspicion supported continued questioning, and probable cause existed to search the vehicle.

## FACTS

[¶ 3] On January 17, 2010, Wyoming Highway Patrol Trooper Karl Germain was on patrol in Laramie County, Wyoming. In the early morning hours, he was seated in his parked patrol car in the median facing west near mile post 349 on Interstate 80. He saw a white Mercedes pass by and observed that it was following too closely behind a semi truck. Trooper Germain left the median and drove eastward to stop the vehicle for following too closely. As he approached, he saw the Mercedes pass the semi truck, come up behind a second semi truck and again follow too closely.

[¶ 4] Trooper Germain caught up with the vehicle and pulled alongside it to check for seatbelt use. As he came alongside, he saw someone sit up rapidly in the front passenger seat. Neither the driver nor the passenger looked in his direction but the vehicle slowed from approximately 65 to 50 miles per hour. The posted speed limit was 75 miles per hour.

---

1. With his motion to suppress, Mr. Phelps filed a motion seeking to discover records showing Trooper Germain's dog's drug detection efforts between 2009 and 2010, police reports of encounters between the dog and citizens in 2009 and 2010, the dog's training records, certifications and re-certifications, any evaluations of the dog during training or certifications, any video recordings of the dog searching for illegal substances, records of controlled negative testing or extinction training, and records showing the substances the dog was trained to detect. The State agreed to produce the dog's deployment, training and certification records but objected to producing any other records on the ground that the request was overly broad. The district court sustained the State's objection to the discovery motion. On appeal, Mr. Phelps and Mr. Fitch assert that the court abused its discretion in sustaining the objection. A conditional plea can preserve for appeal only dispositive issues. *Walters v. State*, 2008 WY 159, ¶ 16, 197 P.3d 1273, 1278 (Wyo.2008). The district court's ruling sustaining the discovery objection is not a dispositive issue. We, therefore, decline to address the issue.

[¶ 5] Trooper Germain pulled behind the vehicle and activated his flashing lights. The Mercedes immediately pulled off the highway onto the shoulder. Trooper Germain advised dispatch that he had initiated a traffic stop of a white Mercedes with a California registration. He then got out of his patrol car and approached the driver's side of the vehicle. He asked the driver, Mr. Fitch, for his driver's license, registration and proof of insurance. Mr. Fitch handed him a temporary Texas driver's license and a rental agreement for the vehicle. The driver's license had an issue date of January 7, 2010, and expiration date of March 8, 2010, and listed a Texas address for Mr. Fitch. The rental agreement identified Mr. Phelps as having rented the Mercedes and showed that he rented it on January 15, 2010, at the San Francisco Airport, was to return it there on February 14, 2010, and paid $2,650.29 for the rental.

[¶ 6] Trooper Germain asked Mr. Fitch where he was coming from and where he was headed. Mr. Fitch replied that he was coming from California and headed to Chicago. Trooper Germain asked what he was going to do in Chicago and Mr. Fitch said he was going to get his instrument rating to become a pilot. Trooper Germain advised Mr. Fitch that he had stopped him for following another vehicle too closely. As he spoke, Trooper Germain noticed that both Mr. Fitch and Mr. Phelps seemed unusually nervous and their arms and hands appeared to be shaking rather violently. He also noticed several pieces of luggage in the back seat of the vehicle. The exchange at the driver's side window of the Mercedes lasted less than one minute.

[¶ 7] Trooper Germain advised Mr. Fitch that he was going to issue him a warning for following too closely and asked him to come back to his patrol car. As Mr. Fitch got out of the Mercedes, the trooper noticed two energy drink bottles in the door compartment. Once in the patrol car, as he filled out the warning, Trooper Germain asked Mr. Fitch more questions, including how long he would be in Chicago, whether he would be living there, who his passenger was, why he was driving to Chicago rather than flying, who had rented the Mercedes, where he was from, whether he was listed as an additional driver on the rental papers, what made him want to be a pilot, whether it cost a lot of money to become a pilot, how he ended up in California, and where Mr. Phelps was from. Mr. Fitch indicated he was not sure how long he would be in Chicago but was moving there temporarily. He said Mr. Phelps was his brother-in-law, had rented the Mercedes, was helping him get to Chicago, would be staying with him there, and had come from Texas to California to rent the vehicle. Mr. Fitch said he did not fly to Chicago because he wanted to make a trip out of it. In response to other questions, Mr. Fitch said he was getting his instrument rating in Chicago rather than California because he liked the school there better; was originally from Texas; had been living in California with his girlfriend; and they had recently broken up. Mr. Fitch indicated he was not sure whether he was listed on the rental agreement as an authorized driver.

[¶ 8] During this exchange, Trooper Germain explained to Mr. Fitch why he had been stopped, what constituted the offense of following too closely, and what he was doing as he filled out the warning. This exchange in the patrol car between Trooper Germain and Mr. Fitch lasted less than six minutes. During the conversation, Trooper Germain noticed that Mr. Fitch continued to be shaky and nervous and appeared to be having trouble breathing and speaking.

[¶ 9] After issuing the warning and speaking with Mr. Fitch, Trooper Germain asked him to remain in the patrol car while he went to speak with Mr. Phelps. In addition to asking Mr. Phelps for identification, Trooper Germain asked him whether he had rented the vehicle, where he was coming from, why he was going to Chicago, how he knew Mr. Fitch, how long he would be in Chicago and whether he would be returning to San Francisco immediately. Mr. Phelps confirmed that he had rented the vehicle, handed the trooper a permanent Texas driver's license and said that he and Mr. Fitch were traveling from California to Chicago for Mr. Fitch's pilot training. He indicated that Mr. Fitch would probably stay in Chicago for a couple of weeks and would likely fly home. Mr. Phelps said he would be conducting some

business in Chicago before heading back to California to return the rental car. During the conversation, Trooper Germain noticed that Mr. Phelps' hands continued to shake. The trooper returned Mr. Phelps' driver's license and went back to the patrol car. The exchange between Trooper Germain and Mr. Phelps lasted about two minutes.

[¶ 10] Back in the patrol car, Trooper Germain asked Mr. Fitch how long he expected the training in Chicago to take, where he was going to live, what he and Mr. Phelps did for a living, how long he had known Mr. Phelps, who was paying for the rental car, whether Mr. Phelps would be doing any business in Chicago, and why he was driving rather than flying to Chicago. Mr. Fitch said he would probably be in Chicago for three months, depending on how long it took him to log his flight hours, would be finding a place to live, was unemployed, was not certain what Mr. Phelps did for work and that Mr. Phelps had paid for the rental car. Trooper Germain returned the rental agreement and gave Mr. Fitch a copy of the warning he had issued. He then asked Mr. Fitch if there was anything illegal inside the Mercedes. Mr. Fitch said there was not. Trooper Germain asked if there was a large amount of cash in the vehicle and Mr. Fitch again said there was not. The trooper then asked separately whether there was marijuana, cocaine, heroin, or methamphetamine in the vehicle. Each time, Mr. Fitch responded negatively. Trooper Germain asked Mr. Fitch if there were guns or explosives in the car. Again, Mr. Fitch said, "No." Trooper Germain asked Mr. Fitch if he had any objection to his drug dog sniffing the Mercedes. The trooper explained that there were discrepancies in the stories he had been given, the trip did not make sense to him and the circumstances seemed consistent with the transportation of controlled substances. Mr. Fitch did not clearly consent to the dog sniff and so Trooper Germain went back to the Mercedes to ask Mr. Phelps for permission to search the vehicle. The second exchange between the trooper and Mr. Fitch inside the patrol car lasted just under four minutes.

[¶ 11] Back at the Mercedes, Trooper Germain asked Mr. Phelps if he had any objection to the dog sniff. As he had done with Mr. Fitch, Trooper Germain explained to Mr. Phelps that the stories given to him were inconsistent and the situation indicated to him that they were transporting controlled substances. Mr. Phelps responded that if they were not under arrest he would like to go. Trooper Germain advised Mr. Phelps that he was not under arrest but that he was being detained. This exchange lasted less than one minute.

[¶ 12] Trooper Germain returned to his patrol car and told Mr. Fitch to go back to the Mercedes and have a seat, that he was being detained while the trooper called for backup before having his drug dog sniff the vehicle. Just over four minutes later, another trooper arrived on the scene. The troopers directed Mr. Fitch and Mr. Phelps to get out of the Mercedes and stand away while Trooper Germain ran the dog around the vehicle. The dog alerted to the presence of a controlled substance. The troopers searched the vehicle, found marijuana and placed Mr. Fitch and Mr. Phelps under arrest.

[¶ 13] Messrs. Fitch and Phelps were each charged with three felony counts: conspiracy to deliver and possess marijuana in violation of Wyo. Stat. Ann. § 35-7-1031(a)(i) (LexisNexis 2009); possession with intent to deliver marijuana in violation of § 35-7-1031(a)(ii); and possession of marijuana in violation of § 35-7-1031(c)(iii). They both filed motions to suppress the evidence seized during the search. Prior to a hearing on the motions, the State moved to join the defendants' cases under Rules 8(b) and 13 of the Wyoming Rules of Criminal Procedure. The defense did not oppose the motion and the district court granted it. The district court subsequently convened a joint hearing on the suppression motions. Following the hearing, the court issued a decision letter and order denying the motions.

[¶ 14] The parties thereafter entered into a plea agreement pursuant to which Messrs. Phelps and Fitch agreed to plead guilty to one count of conspiracy to deliver or possess marijuana in exchange for dismissal of the other counts. As part of the agreement, Mr. Phelps and Mr. Fitch reserved the right to appeal the denial of their suppression mo-

tions. The State agreed to recommend a suspended sentence of eighteen to thirty-six months in prison with three years supervised probation. Following a hearing, the district court entered judgment and sentenced Messrs. Phelps and Fitch in accordance with the plea agreement. They timely appealed to this Court.

## STANDARD OF REVIEW

[¶ 15] When reviewing an order denying a motion to suppress evidence, we defer to the district court's findings of fact unless they are clearly erroneous. *Parks v. State*, 2011 WY 19, ¶ 6, 247 P.3d 857, 858 (Wyo.2011); *Sutton v. State*, 2009 WY 148, ¶ 9, 220 P.3d 784, 787 (Wyo.2009). Because the district court has the opportunity to hear the evidence, assess witness credibility, and draw the necessary inferences, we view the evidence in a light favorable to its determination. *Id.* The question of whether a search was reasonable and comported with the constitution is one of law, which we review *de novo. Id.*

## DISCUSSION

### 1. Denial of Suppression Motion

[¶ 16] Messrs. Phelps and Fitch argue first that the district court erred in denying their motion to suppress the evidence seized in the search of their vehicle because: 1) the search was not "reasonable under all of the circumstances" as required to pass muster under the Wyoming Constitution; 2) the initial stop was not supported by reasonable suspicion; 3) detaining them after the initial stop was not supported by reasonable suspicion; and 4) the drug dog's alert did not establish probable cause to search the vehicle. Article 1, § 4 of the Wyoming Constitution requires that searches and seizures "be reasonable under all of the circumstances." *Vasquez v. State*, 990 P.2d 476, 485–86 (Wyo.1999). The Fourth Amendment to the United States Constitution similarly protects individuals from unreasonable searches and seizures. When properly presented, we consider a claim that a seizure violated Article 1 § 4 of the Wyoming Constitution before we address any Fourth Amendment claim.

*Vasquez*, 990 P.2d at 485–86. We begin by addressing Mr. Phelps' and Mr. Fitch's assertion that the initial stop violated Article 1, § 4.

### a. The Initial Stop

[¶ 17] The decision to stop an automobile is justified under Article 1, § 4 when the officer has probable cause to believe a traffic violation has occurred *or* when the officer has a reasonable suspicion that the particular motorist is engaged in criminal activity. *Fertig v. State*, 2006 WY 148, ¶ 28, 146 P.3d 492, 501 (Wyo.2006). In the present case, the district court's holding that the initial stop was justified was based on its finding that Trooper Germain had probable cause to believe a traffic violation had occurred. Given that finding, it was not necessary that the stop also be supported by reasonable suspicion of criminal activity.

[¶ 18] The finding that probable cause existed to stop the vehicle was based on Trooper Germain's testimony that he decided to stop the vehicle upon observing it following a semi truck too closely in violation of the traffic laws. Messrs. Phelps and Fitch contend Trooper Germain's testimony that he saw the vehicle following a second semi truck too closely is not supported by the patrol car video recording. Because his testimony about the second semi truck is not borne out by the evidence, they assert, his testimony about the first semi truck should have been disregarded.

[¶ 19] We have often said:

In reviewing a trial court's ruling on a motion to suppress evidence, we do not interfere with the trial court's findings of fact unless the findings are clearly erroneous. We view the evidence in the light most favorable to the trial court's determination because the trial court has an opportunity at the evidentiary hearing to assess the credibility of the witnesses, weigh the evidence, and make the necessary inferences, deductions, and conclusions.

*Holman v. State*, 2008 WY 54, ¶ 35, 183 P.3d 368, 377 (Wyo.2008).

[¶ 20] In its decision letter, the district court addressed the evidence relating to the initial stop as follows:

> Trooper Germain testified unequivocally that he observed the [Mercedes] following two separate semi-trucks at a vehicle length or less for significant periods of time—for a quarter mile in one instance, and for five seconds in the other. He testified that the Mercedes was not prevented from passing by traffic in the passing lane. The evidence, if Trooper Germain is believed, would therefore show that the Mercedes was tailgating at an extremely unsafe distance for no apparent reason.
>
> Defendants argue that Trooper Germain could not have observed the events to which he testified. They dispute his ability to view a potential violation from the median for a distance of a quarter of a mile. They also contend that the video shows that the trooper did not observe a second violation as he approached the Mercedes because none can be seen on the recording.
>
> By the time the video began, the Mercedes had passed both semi-trucks. It is consistent with the trooper's testimony to the extent that it shows him passing two semi-trucks as he caught up with the Mercedes. Any additional probative value as it pertains to the alleged traffic violations is minimal. The video does not prove that Trooper Germain's testimony is false—the timing and perspective of the video are such that it does not show that he could not or did not see what he testified to seeing.
>
> On the other hand, Trooper Germain was a credible witness, and his testimony concerning the events after he initiated the stop was consistent with the video. His estimates of the distances between the vehicles and the amount of time that he was able to view the possible violations were estimates by a trained observer. This Court believes his testimony that he did in fact see the [Mercedes] following too closely on two different occasions as he testified.

[¶ 21] Viewing the evidence in the light most favorable to the district court's determination, we conclude the above findings were not clearly erroneous. Wyo. Stat. Ann. § 31–5–210 (LexisNexis 2011) prohibits following another vehicle more closely than is reasonable and provides that a driver following another vehicle shall leave sufficient space so that an overtaking vehicle may enter and occupy the space without danger. Section 31–5–1201 (LexisNexis 2011) makes the violation of § 31–5–210 a misdemeanor. Trooper Germain testified that as he was parked in the median he saw the Mercedes following a semi truck at less than one vehicle length behind. He testified that he observed it following at that distance for approximately a quarter of a mile. He testified that as he approached the Mercedes, he saw it pass the semi truck, move back into the driving lane and then follow a second semi truck at approximately the same distance as it had followed the first one. He testified that he made these observations before the patrol car video started recording. He also testified that he was in the left hand passing lane the entire time. The district court found Trooper Germain to be a credible witness and concluded the video, rather than being inconsistent with his testimony, simply did not show what he did, or did not, observe with regard to the Mercedes passing the semi trucks.

[¶ 22] The video recording does not show the Mercedes traveling behind or passing the semi-trucks. Thus, as the district court concluded, it neither supports nor contradicts the trooper's testimony concerning his observations of the Mercedes following too closely. The video recording does support the trooper's testimony concerning what happened after he stopped the vehicle. We see nothing in the record warranting a conclusion that the district court's credibility determination or finding of probable cause was clearly erroneous or contrary to law. We agree that the initial stop was reasonable under all the circumstances and did not violate Article 1, § 4 of the Wyoming Constitution.

[¶ 23] As under Article 1, § 4, the decision to stop an automobile is justified under the Fourth Amendment when an offi-

cer has probable cause to believe a traffic violation has occurred or when the officer has a reasonable articulable suspicion that the particular motorist is engaged in criminal activity. *Orchard v. State, Dep't of Transp.*, 2011 WY 145, ¶ 11, 262 P.3d 197, 201 (Wyo. 2011). Trooper Germain had probable cause to stop the Mercedes based upon his observation of a traffic violation; the stop did not, therefore, violate the Fourth Amendment.

### b. The Initial Detention

[¶ 24] Messrs. Phelps and Fitch next contend Trooper Germain exceeded the scope of permissible detention under Article 1, § 4 when he questioned them for "forty minutes" after stopping them for a traffic violation. They assert that his lengthy questioning about matters irrelevant to the traffic stop exceeded the scope of the investigatory detention and was not supported by a reasonable suspicion that they were involved in criminal activity.

[¶ 25] We note first that the assertion that Trooper Germain questioned Messrs. Phelps and Fitch for forty minutes is not borne out by the record. The actual questioning lasted less than fifteen minutes. This included Trooper Germain's explanations of why he made the stop, what he was doing in terms of issuing the warning and what the offense of following too closely entailed.

[¶ 26] The district court made the following findings with respect to the initial detention:

Trooper Germain asked roughly 55–60 questions throughout the entire detention. Many of them were clearly permissible, such as the request for a driver's license and registration, and questions concerning who had executed the rental agreement. Others were reasonable so long as they did not prolong the duration of the stop, such as those concerning the presence of contraband and those related to where the Defendants were coming from and going to. Finally, some were probably outside the scope of the stop. For example, Trooper Germaine asked why [Mr.] Fitch wanted to be a pilot, whether it was expensive to become a pilot, and how long his school was going to take.

[¶ 27] The district court concluded: "It appears that some of the questions may have prolonged the traffic stop to a limited extent, and would have been permissible only if reasonable suspicion to suspect the presence of drugs existed." The court then considered whether Trooper Germain had reasonable suspicion justifying inquiries beyond the scope of the traffic stop. In concluding that he did, the court found the following evidence to be of some significance:

- Messrs. Phelps and Fitch were traveling east on I–80 in a California rental car;
- The rental car was a Mercedes, which Trooper Germain testified was unusual for a road trip;
- The vehicle was traveling below the speed limit and slowed even further as the patrol car approached;
- When the trooper was adjacent to the vehicle, both occupants stared straight ahead rather than looking at him;
- Mr. Phelps seemed to pop up in his seat when the patrol car pulled up;
- Mr. Fitch's temporary driver's license was from Texas and showed his address as being in Texas;
- Messrs. Phelps and Fitch were unusually nervous and Mr. Fitch continued to be so even after Trooper Germain told him he would only receive a warning for following too closely.

The district court also mentioned the following evidence, but gave it less weight in determining whether reasonable suspicion supported additional questioning: the energy drinks in the vehicle; the luggage placed in the passenger compartment, rather than the trunk; and the unusual travel plans.

[¶ 28] The district court concluded:

Balancing all of the evidence available at the time the decision was made to inquire further about travel plans, and at the time a decision was made to deploy the drug dog, the Court is compelled to conclude by a very narrow margin that reasonable suspicion existed at both points in time. The use of a very expensive California rental car for an extended period of time, the

dramatic reduction of speed when confronted with the presence of a patrol car, the Defendants' extreme nervousness, and the suspect Texas temporary driver's license provided by [Mr.] Fitch combined to create what is objectively a reasonable suspicion for a well-trained and experienced drug interdiction officer to suspect that [Messrs.] Fitch and Phelps had travelled from Texas to San Francisco to obtain drugs and transport them to Chicago or elsewhere. The total duration of the stop before the Defendants were told that the dog would be deployed was also reasonable for a situation in which the trooper was confronted with a car driven by a non-renter and a temporary license without a photo.

[¶ 29] The district court's factual findings are fully supported by the record and support the conclusion that Trooper Germain's continued questioning of Messrs. Phelps and Fitch was reasonable under all the circumstances as Article 1, § 4 requires. By the time he stopped the vehicle, he had seen the vehicle slow to twenty-five miles per hour below the speed limit as he pulled up alongside. He had also seen a second occupant sit up suddenly in the passenger seat upon the presence of his patrol car. By the time he began questioning the driver inside the patrol car, he knew Messrs. Phelps and Fitch were headed east from San Francisco in a rented Mercedes for which someone was paying a high price; Mr. Fitch's driver's license was temporary, valid for only two months and showed a Texas address; both of the vehicle's occupants appeared unusually nervous; and luggage had been placed in the back seat of the rented Mercedes rather than in the trunk. Within the first few minutes inside the patrol car, he learned that both Mr. Phelps and Mr. Fitch were from Texas; Mr. Phelps had come to San Francisco from Texas for the sole purpose of renting the vehicle and driving it to Chicago and back; and Mr. Fitch did not know whether he was an authorized driver of the rented Mercedes. Thus, in the first few minutes of the stop, Trooper Germain had observed behaviors and obtained information giving rise to a reasonable suspicion that the occupants of the Mercedes were engaged in drug trafficking. Given what he had seen and learned within the first few minutes of the stop, we conclude he had a reasonable suspicion of criminal activity sufficient to support questioning Messrs. Phelps and Fitch beyond the scope of the traffic stop. Under all of the circumstances, Trooper Germain's actions were reasonable and did not violate Article 1, § 4.

[¶ 30] Citing *O'Boyle v. State,* 2005 WY 83, 117 P.3d 401 (Wyo.2005), Mr. Phelps and Mr. Fitch contend otherwise. There, this Court held a search was not reasonable under all of the circumstances under Article 1, § 4 where, after making a traffic stop, the trooper detained the defendant in the patrol car for further questioning beyond the scope of the stop even though he did not have a reasonable suspicion that the defendant was engaged in criminal activity. Importantly in *O'Boyle,* ¶ 32, 117 P.3d at 410–11, there was no contention the trooper had a reasonable suspicion of criminal activity to support further questioning and investigative detention. Rather,

the State conceded: "While Trooper Peech was suspicious of Defendant, his suspicions did not rise to the level that would justify continued investigative detention, a fact which he made explicit by returning Defendant's license and paperwork, releasing him, and informing him that he was free to go." Likewise, at the suppression hearing, the State informed the district court it was not contending there was reasonable suspicion of other illegal activity. Consistent with the State's representations, Trooper Peech testified he did not have a suspicion sufficient to warrant further detention or a search.

*Id.,* n. 6.

[¶ 31] Given this distinction, *O'Boyle* is of little value here where the issue we are asked to decide is whether Trooper Germain had a reasonable suspicion of criminal activity supporting his actions. In this context, *Negrette v. State,* 2007 WY 88, 158 P.3d 679 (Wyo.2007) is more helpful. There, a trooper stopped a vehicle after observing it traveling twenty miles per hour below the speed limit and receiving information from dispatch that

the license plate was not on file. In the course of questioning Mr. Negrette in the patrol car after the traffic stop, the trooper became increasingly suspicious that criminal activity was afoot and decided to run his drug dog around the vehicle. The dog alerted and the trooper searched the vehicle and found marijuana.

[¶ 32] In *Negrette*, the evidence showed:

the license plate on the pickup was not on file; the registration had been altered; the license plate number did not match the registration; the occupants of the pickup had traveled from Illinois to Oregon for a two day visit; Mr. Negrette did not know the names of the people he had just visited in Oregon; Mr. Negrette said he had borrowed the pickup from a friend named Gilbert Mendoza but the proof of insurance card showed the owner as Gilberto Maldonado; the VIN was a duplicate; Mr. Negrette seemed to change the subject whenever Deputy Hodge brought up a subject that made him uncomfortable; Mr. Negrette appeared nervous when he could not remember the names of the people he had just visited; and Deputy Hodge was unable to verify that the license plates belonged on the pickup.

*Id.,* ¶ 15, 158 P.3d at 683. We concluded:

Although any of these circumstances alone may not have justified the detention, the totality of the circumstances were sufficient to support the conclusion that Deputy Hodge had reasonable suspicion to believe Mr. Negrette had committed or might be committing a crime and to detain him. The detention was reasonable under all of the circumstances and did not violate the Wyoming Constitution.

*Id.,* ¶ 16, 158 P.3d at 683.

[¶ 33] Similarly, we conclude in the present case that the totality of the circumstances was sufficient to support the conclusion that Trooper Germain had reasonable suspicion that Mr. Fitch and Mr. Phelps were transporting controlled substances. Questioning them about matters outside the scope of the traffic violation was, therefore, reasonable under all of the circumstances and did not violate Article 1, § 4 of the Wyoming constitution.

[¶ 34] We likewise conclude the seizure was reasonable under the Fourth Amendment, which requires application of the following principles:

An investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification. During a routine traffic stop, a law enforcement officer may request the driver's proof of insurance, operating license, and vehicle registration, run a computer check, and issue a citation or warning. The officer may detain the driver and his vehicle only for the period of time reasonably necessary to complete these routine matters. Once the driver has produced a valid driver's license and proof that he is entitled to operate the vehicle, he must be allowed to proceed without further delay. During the stop, an officer generally may not ask the detained motorist questions unrelated to the purpose of the stop, including questions about controlled substances, unless the officer has reasonable suspicion of other illegal activities.

*Lovato v. State,* 2010 WY 38, ¶ 24, 228 P.3d 55, 60–61 (Wyo.2010) (citation omitted). Trooper Germain had reasonable suspicion that Mr. Phelps and Mr. Fitch were involved in drug trafficking and his questions unrelated to the stop, including questions about controlled substances, did not violate the Fourteenth Amendment.

### c. *Probable Cause for the Search*

■ [¶ 35] Messrs. Phelps and Fitch contend the drug dog's alert was not sufficient to establish probable cause for the search. They assert the dog had insufficient training, had a less than perfect record and was improperly cued by Trooper Germain to enter the vehicle. The State responds the dog was trained and certified to serve as a drug dog, had performed reliably in the past and her alert on this occasion established probable cause for the search.

■ [¶ 36] Under the United States and Wyoming constitutions, searches and seizures conducted without a warrant are per se

unreasonable unless they are justified by probable cause or recognized exceptions. *Baker v. State*, 2010 WY 6, ¶ 22, 223 P.3d 542, 547 (Wyo.2010). Probable cause necessary to justify searching a vehicle without a warrant exists where the known facts and circumstances are sufficient to warrant a man of reasonable prudence to believe that contraband or evidence of a crime will be found. *Tucker v. State*, 2009 WY 107, ¶ 22, 214 P.3d 236, 243 (Wyo.2009). An alert by a properly trained and reliable drug dog provides probable cause to search a vehicle. *Dickey v. State*, 2011 WY 136, ¶ 14, 261 P.3d 739, 743 (Wyo.2011); *Lovato*, ¶ 25, 228 P.3d at 61.

[¶ 37] Both parties in this case presented expert testimony on the issue of the drug dog's reliability. The defense expert testified that the dog was unreliable because it passed by the rear of the vehicle where the marijuana was located without alerting. Then, rather than being drawn to the open driver's side window by an odor, the dog alerted only after the trooper invited her up to the open window. The defense expert testified that a reliable dog that has detected the odor of a controlled substance leads the handler. He testified that in his opinion based upon the video recording, the dog in this case did not behave like she had detected an odor but instead was being led by the trooper and her response resulted from his unintentional cues. The defense expert also testified that the training records were inadequate to conclude the dog was reliable.

[¶ 38] The State's expert testified that in his opinion Trooper Germain deployed the dog appropriately and she responded appropriately. He testified that in his opinion based upon the video the dog responded to an odor that she detected and not to a cue from Trooper Germain. He testified that a dog may not alert to the exact location of a controlled substance for different reasons, including the manner in which the substance is packaged and wind direction. He further testified concerning the testing process that led to this dog's certification, how that process assures reliability and that a successful certification after that testing process demonstrates that a dog is sufficiently reliable to be used in vehicle sniffs.

[¶ 39] After considering the conflicting expert testimony, the district court found no reason to disregard the certifications and no evidence to suggest the dog was unreliable. Responding to the argument that the dog was unreliable because she alerted at the driver's open window and not the trunk, the district court stated:

> [D]ogs alert to the odor of drugs, not to the drugs themselves. The marijuana was packaged carefully, and it is no secret that the wind may impact the dispersion of odors, which may pass through spaces inside and outside the vehicle. It is certainly not unlikely that the odor was more readily detected through the window, where it had been trapped in the passenger compartment, than outside the trunk, where it could disperse in the open air and the wind, if there was any at the time.

The district court also found it significant that the United States District Court for the District of Wyoming had recently found Trooper Germain and the dog to be reliable. *U.S. v. Trestyn and Herren*, Case No. 09–CR–216–J (D.Wyo. January 21, 2010) (Order Denying Motion for Reconsideration of Motion to Suppress).

[¶ 40] In *United States v. Ludwig*, 641 F.3d 1243, 1250–51 (10th Cir.2011), the Court, citing *United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir.2009), reiterated that "a positive alert by a certified drug dog is generally enough, by itself, to give officers probable cause to search a vehicle." Further, although "it surely goes without saying that a drug dog's alert establishes probable cause only if the dog is reliable," that does not mean courts must "mount a full-scale statistical inquisition into each dog's history." *Ludwig*, 641 F.3d at 1251. Instead, courts typically rely on the dog's certification as proof of its reliability. *Id.*

 [¶ 41] The dog and Trooper Germain were certified in 2008 by an Idaho K–9 facility. They were recertified in 2009 and 2010 by the California Narcotic Canine Association. They were never denied certification. The district court was entitled to rely on the certifications as proof of the dog's

reliability. The certifications, together with the video recording showing the dog's alert, were sufficient to support the conclusion that probable cause existed for the search.

[¶ 42] We affirm the convictions and sentences.