# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 137

OCTOBER TERM, A.D. 2015

October 23, 2015

CARL WAYNE ALLGIER,

Appellant
(Defendant),

v.                                                         S-15-0044

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Albany County*
*The Honorable Jeffrey A. Donnell, Judge*

*Representing Appellant:*
> Office of the State Public Defender: Diane M. Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel; Patricia L. Bennett, Assistant Appellate Counsel.  Argument by Ms. Bennett.

*Representing Appellee:*
> Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Jenny L. Craig, Senior Assistant Attorney General; Joshua C. Eames, Assistant Attorney General.  Argument by Mr. Eames.

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Justice.**

[¶1]    Appellant Carl Wayne Allgier was the passenger in a car stopped for a traffic violation by a Wyoming Highway Patrol trooper.  After Mr. Allgier appeared to have suffered a seizure, the trooper searched the pocket of the jacket Mr. Allgier had left in the car and discovered marijuana.  A subsequent search of the car revealed felony quantities of marijuana and drug paraphernalia.  Following the district court's denial of his motion to suppress evidence, Mr. Allgier entered a conditional guilty plea to one count of possession of a controlled substance, in violation of Wyo. Stat. Ann. § 35-7-1031(c)(i)(A), and was sentenced to three to five years' incarceration.  Mr. Allgier appeals the district court's ruling on his motion to suppress, claiming that the initial stop and subsequent search of his jacket violated the Fourth Amendment.  Because the trooper had reasonable suspicion that the driver of the vehicle was breaking the law, and because the search of his jacket was justified by the community caretaker exception to the warrant requirement, we conclude that the stop and subsequent search did not violate Mr. Allgier's Fourth Amendment right to be free from unreasonable searches and seizures. We affirm.

## ISSUES

[¶2]    We rephrase the issues as follows:

1.    Did the trooper have a reasonable suspicion that the driver of the car in which Mr. Allgier was riding was breaking the law by following too closely behind the vehicle in front of him?

2.    Was the subsequent search of Mr. Allgier's jacket justified by an exception to the constitutional prohibition against warrantless searches?[1]

## FACTS

[¶3]    On the afternoon of March 12, 2014, Wyoming Highway Patrol Trooper Tegdesth, who was traveling southbound on U.S. Highway 287 in Albany County, observed a white Jeep Grand Cherokee traveling northbound, about fifty feet behind a silver passenger vehicle.  Trooper Tegdesth also noticed that the jeep had a cracked windshield.  He turned around and activated his lights to pursue the jeep, pulling the driver over for following too closely and for having a cracked windshield.  The jeep was driven by George Maestas; Mr. Allgier was seated in the front passenger seat.  The trooper's initial sighting of the vehicle and the encounter that followed were recorded on the video by the trooper's L3 Camera System.

---

[1] Both parties briefed a third issue: the constitutionality of the initial detention of Mr. Allgier.  However, at oral argument, Mr. Allgier's attorney indicated that there are only two issues on appeal:  the initial stop, and the search of Mr. Allgier's jacket.  Because the third issue was withdrawn at oral argument, we will not address it here.

1

[¶4]   Trooper Tegdesth approached the passenger side of the jeep, startling Mr. Allgier, who had just lit a cigarette.  He informed Mr. Maestas of the reason for the stop and asked for his identification and insurance information.  He also asked Mr. Allgier for his license because he was not wearing a seatbelt.  Trooper Tegdesth then initiated a conversation with Mr. Maestas and Mr. Allgier as to the general nature of their travel plans.  They indicated they had been in Fort Collins, Colorado, visiting Mr. Allgier's girlfriend, and that they were headed to Green River, Wyoming.  Trooper Tegdesth then asked Mr. Allgier the name of his girlfriend, but Mr. Allgier responded with a "blank stare," a pause lasting four seconds, and then, "What?"  Trooper Tegdesth questioned whether he knew her name and Mr. Allgier replied that he did but it was his business and he wasn't going to tell the trooper.  By this time, tensions were escalating and Mr. Allgier had begun to raise his voice.

[¶5]   Trooper Tegdesth asked why Mr. Allgier had an "attitude all of a sudden" and why he had lit up a cigarette.  Mr. Allgier replied that he was "getting irritated."  Trooper Tegdesth inquired whether there were any weapons in the vehicle and Mr. Allgier denied having any.  Trooper Tegdesth testified that at this point, given Mr. Allgier's contentious behavior, "red flags" were going up in his mind and that, based upon his training and experience, Mr. Allgier's behavior was not characteristic of the "innocent motoring public."  Because he was concerned for his safety, Trooper Tegdesth asked Mr. Allgier to step out of the vehicle.  Mr. Allgier refused, and Trooper Tegdesth then reached inside the passenger side window, unlocked the passenger door, and opened it.  Mr. Allgier removed his jacket as he stepped out and threw it in the back seat of the vehicle.  Trooper Tegdesth testified that this behavior "caused even more concern;" that once he was out of the car, it appeared as if Mr. Allgier "wanted a confrontation;" and that "he was going to try to fight me or something of that sort."

[¶6]   Once Mr. Allgier was out of the vehicle, Trooper Tegdesth, who was standing behind him, reached for Mr. Allgier's arms from behind and began to pat him down.  Mr. Allgier became rigid, began yelling and complaining of shoulder pain.  Trooper Tegdesth found a Kershaw pocket knife in Mr. Allgier's rear left pocket.  Trooper Tegdesth testified that this caused him even more concern because Mr. Allgier had earlier indicated he had no weapons.  At this point, Mr. Allgier appeared to suffer a seizure, fell to his knees, and then the ground, and began to shake.  Trooper Tegdesth testified that he was unsure whether Mr. Allgier was having a seizure or faking it, so he handcuffed him before going to his patrol car and calling for an ambulance and back up.

[¶7]   Trooper Tegdesth returned to check on Mr. Allgier, informing him that he had called for an ambulance and repeatedly telling him to relax.  Trooper Tegdesth also asked Mr. Allgier if he had any medication.  Mr. Allgier responded that he did not.  The trooper approached the vehicle and, while taking the jacket from the backseat, asked Mr. Maestas "any meds in here?"  He then looked in one of the pockets and saw a plastic purple

2

prescription bottle, which appeared to have a label on it. Trooper Tegdesth recognized the bottle as the type that comes from medical marijuana dispensaries in Colorado. He removed the bottle from the jacket pocket and saw that the label on it was indeed a medical marijuana label with Mr. Allgier's name on it. Trooper Tegdesth then opened the bottle and found what he suspected to be marijuana inside.

[¶8] Trooper Tegdesth ordered Mr. Maestas to get out of the jeep, handcuffed him, and placed him in his highway patrol car. Trooper Tegdesth then returned to check on Mr. Allgier and waited with him until the ambulance arrived.

[¶9] A subsequent search of the jeep revealed a felony amount of marijuana, along with other drug paraphernalia. Both Mr. Allgier and Mr. Maestas were charged with one count of possession of a controlled substance and one count of unlawful possession with intent to deliver a controlled substance.

[¶10] Mr. Allgier moved to suppress the evidence found by Trooper Tegdesth during his search of the jacket and the vehicle. After a hearing, the district court denied the motion. Mr. Allgier and the State then entered into a conditional plea agreement, pursuant to which Mr. Allgier pled guilty to felony possession of marijuana; the State dismissed the possession with intent to distribute charge; and Mr. Allgier preserved his right to appeal the denial of his motion to suppress. The district court accepted the plea agreement and sentenced Mr. Allgier to three to five years in prison. This appeal followed.

## STANDARD OF REVIEW

[¶11]     We review the district court's factual findings on a motion to suppress for clear error. We defer to those findings and view the evidence in the light most favorable to the prevailing party because the district court is in the best position to weigh the evidence, assess the credibility of witnesses, and make the necessary inferences, deductions, and conclusions. However, "we review the ultimate determination regarding the constitutionality of a particular search or seizure de novo."

*Ward v. State*, 2015 WY 10, ¶ 13, 341 P.3d 408, 410-11 (Wyo. 2015) (citations omitted). Further, a "district court judgment may be affirmed on any proper legal grounds supported by the record." *Lovato v. State*, 2012 WY 10, ¶ 6, 269 P.3d 426, 428 (Wyo. 2012) (citing *Feeney v. State*, 2009 WY 67, ¶ 9, 208 P.3d 50, 53 (Wyo. 2009)).

3

*DISCUSSION*

**I.** ***Did the trooper have a reasonable suspicion that the driver of the car in which Mr. Allgier was riding was breaking the law by following too closely behind the vehicle in front of him?***

[¶12] Mr. Allgier contends that the traffic stop made by Trooper Tegdesth violated his federal constitutional rights against unwarranted search and seizure. Mr. Allgier's argument relies on Fourth Amendment decisions and does not advance an argument under the state constitution. We will, therefore, decide this issue under the Fourth Amendment. *See Garvin v. State*, 2007 WY 190, ¶ 11 n.1, 172 P.3d 725, 728 n.1 (Wyo. 2007); *Vasquez v. State*, 990 P.2d 476, 489 (Wyo. 1999).

[¶13] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

[¶14] In *Tiernan v. State, Department of Transportation*, we attempted to clarify the distinction between probable cause and reasonable suspicion for a traffic stop. 2011 WY 143, ¶ 12, 262 P.3d 561, 565 (Wyo. 2011). We held there that "the question is whether the evidence supported the conclusion that the trooper had probable cause to stop Mr. Tiernan's vehicle" for the traffic violation. *Id.; see also State v. Holohan*, 2012 WY 23, ¶ 9, 270 P.3d 693, 696 (Wyo. 2012); *Espinoza v. State ex rel. Dep't of Transp.*, 2012 WY 101, ¶ 7, 280 P.3d 1226, 1229 (Wyo. 2012); *Phelps v. State*, 2012 WY 87, ¶ 17, 278 P.3d 1148, 1153 (Wyo. 2012); *Orchard v. State Dep't of Transp.*, 2011 WY 145, ¶ 11, 262 P.3d 197, 201 (Wyo. 2011). The United States Supreme Court, however, has recently stated that the correct standard to justify a traffic stop is "reasonable suspicion." *Heien v. North Carolina*, --- U.S. ---, ---, 135 S.Ct. 530, 536, 190 L.Ed.2d 475 (2014). "The primacy of the Supreme Court of the United States in constitutional areas is firmly e[m]bedded in our law by judicial decision and in our own State Constitution, Art. 1, § 37, and Art. 21, § 24." *Doe v. Burk*, 513 P.2d 643, 644 (Wyo. 1973). To the extent that they conflict with the reasonable suspicion standard articulated in *Hein, Tiernan* and its progeny are hereby overruled.

4

A traffic stop for a suspected violation of law is a "seizure" of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment. *Brendlin v. California*, 551 U.S. 249, 255-259, 127 S.Ct. 2400, [2406-2408,] 168 L.Ed.2d 132 (2007). . . . [T]o justify this type of seizure, officers need only "reasonable suspicion"—that is, "a particularized and objective basis for suspecting the particular person stopped" of breaking the law. *Prado Navarette v. California*, 572 U.S. ---, ---, 134 S.Ct. 1683, 1687-88, 188 L.Ed.2d 680 (2014) (internal quotation marks omitted). . . .

"[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 573 U.S. ---, ---, 134 S.Ct. 2473, 2482, 189 L.Ed.2d 430 (2014) (some internal quotation marks omitted). To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them "fair leeway for enforcing the law in the community's protection." *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, [1311,] 93 L.Ed. 1879 (1949).

*Heien*, --- U.S. at ---, 135 S.Ct. at 536; *see also Venegas v. State*, 2012 WY 136, ¶ 9, 287 P.3d 746, 749 (Wyo. 2012); *Dods v. State*, 2010 WY 133, ¶ 8, 240 P.3d 1208, 1209 (Wyo. 2010). "Reasonable suspicion is a lower standard than probable cause and requires a fact-centered inquiry based upon the 'totality of the circumstances.'" *Venegas*, 2012 WY 136, ¶ 9, 287 P.3d at 749 (citation omitted); *see also Yeouth v. State*, 2009 WY 61, ¶ 21, 206 P.3d 1278, 1284 (Wyo. 2009); *Fender v. State*, 2003 WY 96, ¶ 13, 74 P.3d 1220, 1225 (Wyo. 2003).

[¶15] Trooper Tegdesth initially pulled the vehicle over for two suspected traffic violations: following too closely, in violation of Wyo. Stat. Ann. § 31-5-210, and driving with a cracked windshield, in violation of Wyo. Stat. Ann. § 31-5-955(a). Section 31-5-210(a) of the Wyoming Statutes provides, in pertinent part, that a driver "shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway." Wyo. Stat. Ann. § 31-5-210(a) (LexisNexis 2015). Section 31-5-955(a) of the Wyoming Statutes prohibits a person from driving a vehicle with a "crack . . . which materially obstructs, obscures or impairs the driver's clear view of the highway or any intersecting highway." Wyo. Stat. Ann. § 31-5-955(a) (LexisNexis 2015). Mr. Allgier argues that neither provided reasonable suspicion to stop the vehicle in which he was riding.

5

[¶16] With regard to the following too closely allegation, Mr. Allgier concedes that the vehicle he was in was traveling approximately one car length behind the vehicle in front of him. However, he argues the distance between the vehicles does not determine whether the vehicle was following too closely without knowing the speed at which they were traveling. He points out that Trooper Tegdesth did not know the actual speed of the vehicles, and he argues that because the two vehicles were following behind a semi-truck, they may have been traveling at a speed slower than the 65 miles per hour (mph) speed limit.

[¶17] In *Phelps*, the defendant challenged a traffic stop under Wyo. Stat. Ann. § 31-5-210, the statute at issue here. 2012 WY 87, ¶¶16, 21, 278 P.3d at 1152, 1154. In that case, the trooper who stopped the defendant testified that he witnessed the defendant's car following two different semis with less than one vehicle length of space between the car and the semi. *Id*. at ¶ 21, 278 P.3d at 1154. The district court relied on his testimony and found that the traffic stop was reasonable under the circumstances. *Id*. at ¶ 22, 278 P.3d at 1154. We affirmed, holding the district court's conclusion that the trooper had probable cause to believe that a traffic violation had occurred was not clearly erroneous or contrary to law. *Id*. at ¶¶ 22-23, 278 P.3d at 1154-55.

[¶18] Here, as in *Phelps*, the district court made a factual finding that the car driven by Mr. Maestas was following too closely, and that finding was not clearly erroneous. Mr. Allgier argues that because there was no evidence of the speed they were traveling, the district court could not reasonably conclude that they were following too closely. The district court did make calculations premised on the assumption that the vehicles were traveling at the speed limit of 65 mph.[2] Nevertheless, the district court found that when the silver passenger car passed the trooper who was headed in the opposite direction on the highway, Mr. Maestas's jeep was only approximately 50 feet behind. In addition,

_____

[2] Trooper Tegdesth testified that the two or three second rule is often used to determine whether a vehicle is following at a safe distance. In performing its analysis, the district court discussed the various ways a trooper could determine a "reasonable and prudent" distance between two vehicles and specifically addressed the two and three second rule referred to by Trooper Tegdesth, as well as the rule of thumb that one ought to follow at one vehicle length for every ten mph of travel. The district court made a series of calculations based upon an assumption that the vehicles were traveling at the 65 mph speed limit: "the 'two second rule' would require a minimum distance of about 190 feet and the 'three second rule' about 285 feet[,]" and the "'one car length rule' would require about 105 feet, assuming a vehicle length of fifteen feet." Because there was no testimony as to the speed of the vehicles, these calculations could not provide an absolute answer to the question of what a safe distance would have been in this instance. We note that the two or three second rule does not specifically require a calculation based upon the speed of the driver. In fact, that is the benefit of the rule for a trooper on the side of the road. Instead of calculating the speed of a following vehicle, the trooper need only count seconds between the vehicles to determine whether there is adequate space. *See United States v. Hunter*, 663 F.3d 1136, 1142-43 (10th Cir. 2011) (while speed and distance may be an acceptable methodology for determining a safe following distance, the two second rule of thumb is also an appropriate method for determining whether a vehicle is following at a reasonable distance).

6

Trooper Tegdesth testified that there was "very little space" between the vehicles and that "if something were to happen, there would be little reaction time[.]" The district court relied upon the video recording to support the trooper's testimony concerning his observations that the jeep was following too closely.

[¶19] Viewing the evidence in the light most favorable to the district court's determination, we conclude that its findings were not clearly erroneous. Wyoming law prohibits following another vehicle more closely than is "reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway." Wyo. Stat. Ann. § 31-5-210(a). Trooper Tegdesth had a reasonable suspicion, "a particularized and objective basis," for suspecting Mr. Maestas of breaking the law that prohibits following another vehicle more closely than is "reasonable and prudent." After a de novo review of the applicable law, we find that the initial stop was reasonable under the circumstances and did not violate the Fourth Amendment to the United States Constitution.

[¶20] Because we have determined that the initial stop was permissible based upon the reasonable suspicion that there was a violation of Wyo. Stat. Ann. § 31-5-210(a), we need not reach the question of whether Trooper Tegdesth had a reasonable suspicion that the jeep was in violation of Wyo. Stat. Ann. § 31-5-955(a).

## II. Was the subsequent search of Mr. Allgier's jacket justified by an exception to the constitutional prohibition against warrantless searches?

[¶21] Mr. Allgier also takes issue with the search of his jacket. The district court applied the emergency assistance exception and concluded that because Trooper Tegdesth was faced with a medical emergency, the warrantless search of Mr. Allgier's jacket for medication was reasonable. Mr. Allgier contends that the search was not justified by the medical emergency exception to the warrant requirement and that the search violated his Fourth Amendment right to be free of unreasonable search and seizure. Although we agree the emergency assistance exception does not apply to these circumstances, the related community caretaker exception does.

[¶22] Mr. Allgier points out that Trooper Tegdesth had three stories as to why he searched the jacket. First, the video evidence suggests that the trooper was searching the jacket for medication. Second, in his affidavit of probable cause, Trooper Tegdesth stated that he searched the jacket because he believed Mr. Allgier was attempting to hide contraband when he removed it. Finally, at the suppression hearing, Trooper Tegdesth testified that he searched the jacket for additional weapons. He explained that he feared for his safety because Mr. Maestas could possibly access the jacket and because he had already found a weapon on Mr. Allgier's person. Although giving three different explanations at different times may not enhance one's credibility, we recognize that all three of them may have run through the trooper's mind, and we defer to the district

7

court's assessment of witness credibility. *Ward*, 2015 WY 10, ¶ 13, 341 P.3d at 410-11. The district court chose to rely upon the video evidence in concluding that the emergency assistance doctrine applied.[3]

[¶23] The district court found the following: Trooper Tegdesth "was presented with an emergency situation when Mr. Allgier dropped to the ground and began to have an apparent seizure." After securing Mr. Allgier and requesting an ambulance, Trooper Tegdesth returned and informed him that he had called for an ambulance and repeatedly told Mr. Allgier to relax. The trooper then asked if he had any medication. Mr. Allgier replied that he did not have his medication with him. At this point, Trooper Tegdesth yelled to Mr. Maestas, asking him if he had any medication. Trooper Tegdesth located the jacket Mr. Allgier had removed earlier, held it up, and asked whether there was any medication in the jacket. The jacket pockets were not closed, and, as he looked at one of the pockets, he observed the purple prescription bottle with the label on it indicating it was prescribed to Mr. Allgier and which in fact contained marijuana. These findings of fact are supported by the evidence and are not clearly erroneous.

[¶24] In examining whether a search is justified, we look to "a standard of objective reasonableness without regard to the underlying intent or motivation of officers involved." *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978); *see also Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996) (in traffic stop case, holding that "Subjective intentions play no role in ordinary probable-cause Fourth Amendment analysis.").

> [T]he subjective intent of the police officer is irrelevant unless it is conveyed to the person being detained, and like all search and seizure cases, the inquiry is very fact oriented. The reasonable person standard also means the subjective perceptions of the suspect are irrelevant to the court's inquiry. Finally, the reasonable person standard "presupposes an *innocent* person."

*Wilson v. State*, 874 P.2d 215, 220-21 (Wyo. 1994) (citations omitted) (emphasis in original) (applying same standard to issue of when consensual contact becomes seizure).

---

[3] The district court noted:

> Trooper [Tegdesth] testified that he also wanted to make sure there were no weapons in the jacket, given the earlier discovery of Mr. Allgier's knife and the fact that he was unable to devote any attention to Mr. Maestas because of the apparent medical situation. This may well be true, but it appears from the videotape that he was more interested in finding some medication for Mr. Allgier.

[¶25] As we explained in the preceding section, the Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *See supra* ¶ 13. Searches conducted without a warrant are presumptively unreasonable. *Moulton v. State*, 2006 WY 152, ¶ 16, 148 P.3d 38, 43 (Wyo. 2006). This presumption may be overcome if the warrantless search can be justified by probable cause or by established exceptions. *Campbell v. State*, 2014 WY 156, ¶ 17, 339 P.3d 258, 262 (Wyo. 2014).

[¶26] Two related, but distinct, exceptions to the warrant requirement are the community caretaker and the emergency assistance exceptions. *See Campbell*, 2014 WY 156, ¶ 17, 339 P.3d at 262. Both of these exceptions "find their roots in the United States Supreme Court decision in *Cady v. Dombrowski*, 413 U.S. 433, 441-42, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973)." *Campbell*, 2014 WY 156, ¶ 17, 339 P.3d at 262.

[¶27] We first address the emergency assistance exception in order to clarify the distinction between it and the community caretaker exception. The emergency assistance exception allows police to enter homes in the event of an emergency. Because of the "much greater expectation of privacy traditionally accorded the home, a higher standard [than with the community caretaker exception] must be met to permit use of evidence discovered by entry without a warrant." *Id*. at ¶ 20, 339 P.3d at 263. Thus, under the emergency assistance exception, evidence found after a warrantless entry into a home or residence is admissible "only if the officer who enters has a reasonable belief that there exists an emergency requiring immediate action to assist citizens or to prevent harm to persons or property in the residence" and there is a reasonable nexus between the emergency and the area searched. *Id*. at ¶ 20, 339 P.3d at 263.

[¶28] In contrast to the emergency assistance exception, the community caretaker exception applies generally to places and situations where there is a lower expectation of privacy than in a personal residence or home, such as a vehicle:

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community

9

caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

*Dombrowski*, 413 U.S. at 441, 93 S.Ct. at 2528. Thus, the community caretaker exception "pertains to police encounters with citizens in public places and in their vehicles under circumstances giving rise to concerns about their welfare or safety, even though the circumstances do not present an emergency." *Campbell*, 2014 WY 156, ¶ 18, 339 P.3d at 263. "Since there is a lesser privacy expectation in a vehicle on a public highway, an involuntary search or seizure there is judged by a lower standard of reasonableness: a specific and articulable concern for public safety requiring the officer's general assistance." *Id*. at ¶ 21, 339 P.3d at 264 (quoting *State v. Ryon*, 108 P.3d 1032, 1043 (N.M. 2005)). "[T]he totality of the circumstances must be examined at the inception of the officer's action to determine whether the search and/or seizure was reasonably related in scope to the circumstances." *Morris v. State*, 908 P.2d 931, 936 (Wyo. 1995). Moreover, the analysis under the community caretaker exception is fact-based, ultimately requiring a determination of whether the officer's action was reasonable under the circumstances. *Id*. at 937.

[¶29] The United States Supreme Court first applied the community caretaker doctrine in *Dombrowski*, recognizing that local police officers have a responsibility to undertake "community caretaking functions" for reasons of basic community safety. 413 U.S. at 441-42, 93 S.Ct. at 2528. The *Dombrowski* court approved the search of a car's trunk after the drunken driver had been involved in an accident which left him comatose. The police searched the car because the driver was an off-duty police officer from another jurisdiction, and the police reasonably believed the officer's service revolver would be a hazard if left in the trunk of the abandoned car. *Id*., 413 U.S. at 446-47, 93 S.Ct. at 2530.

[¶30] This Court recognized the exception in *Wilson*, where an officer stopped his patrol car to assist the defendant who was limping as he walked down the sidewalk. 874 P.2d at 217. We held:

> The community caretaker function outlined in *Dombrowski*, 413 U.S. at 441, 93 S.Ct. at 2528, permits police to act in a manner that enhances public safety. The police officer's observation of specific and articulable facts, Wilson's lunging walk with a severe limp, reasonably justified a brief inquiry into his condition and the possible cause, such as whether Wilson was a victim of criminal conduct.

*Wilson*, 874 P.2d at 221 (citations omitted). This Court also applied the exception where patrol officers questioned a defendant involved in a car accident in order to determine whether there were one or two passengers in the vehicle with him. We held that because

10

the officers had found only one of the passengers and because the defendant had originally told them that there were two passengers in the vehicle, "they were justifiably concerned that another person was in the vicinity who possibly needed immediate medical attention." *Bloomquist v. State*, 914 P.2d 812, 821-22 (Wyo. 1996).

[¶31] In *Morris*, we rejected the application of the community caretaker exception. There, deputies found the defendant sleeping in the backyard of a private home, woke him, and, because he was disoriented and unsteady, escorted him to the sheriff's office in their patrol car so that he could contact someone for a ride. *Morris*, 908 P.2d at 933. The defendant was alert and conscious enough to "ask questions, answer questions, and keep his faculties about him. In fact, [he] was functioning well enough to give the Deputy a phone number to call and the name of the person he was calling." *Id*. at 937. When the deputy got an answering machine, the defendant reached for his wallet to give him another number to call and realized that the wallet was missing. *Id*. at 933. The deputy, recalling that the defendant had his wallet in the patrol car, offered to look for the wallet. *Id*. As he left to retrieve the wallet, the defendant was sitting in a chair in the interview room, smoking a cigarette. *Id*. at 937. The deputy found the wallet, opened it, and decided to search it for identification, revealing a folded piece of paper containing methamphetamine. *Id*. at 933-34. We held that under the totality of the circumstances there were no specific and articulable facts to justify the search pursuant to an officer's community caretaker function and that the warrantless search of the defendant's wallet was, therefore, unconstitutional. *Id*. at 937.

[¶32] Mr. Allgier claims that Trooper Tegdesth's search of his jacket cannot be justified because, at the time of the search, he was not having a seizure and was awake and responsive. The community caretaker exception does not require a belief that immediate aid is necessary, rather, it requires a specific and articulable concern for public safety requiring the officer's general assistance. *Campbell*, 2014 WY 156, ¶ 18, 339 P.3d at 263. Faced with making split-second decisions in this situation where Mr. Allgier had suffered what appeared to be a seizure moments earlier and while waiting for emergency medical care to arrive, even though Mr. Allgier said he had no medication, it was reasonable for Trooper Tegdesth in the exercise of his community caretaker function to search Mr. Allgier's jacket for medication in an attempt to assist him.

[¶33] Our de novo review of the ultimate determination regarding the constitutionality of the search of Mr. Allgier's jacket in this case leads us to conclude that Trooper Tegdesth's actions did not violate constitutional prohibitions against unreasonable searches and seizures. We find that the district court's conclusion that the emergency assistance exception to the warrant requirement applies was erroneous. However, we can affirm a district court judgment on any proper legal grounds supported by the record. *Lovato*, 2012 WY 10, ¶ 6, 269 P.3d at 428. Looking at the totality of the circumstances, we find that the community caretaker exception applies in this case: Trooper Tegdesth had a sufficiently specific and articulable concern for the safety of Mr. Allgier, and his

search of Mr. Allgier's jacket was reasonably related in scope to the safety concern. The search of Mr. Allgier's jacket did not violate the Fourth Amendment to the United States Constitution.

## *CONCLUSION*

[¶34] We affirm the district court's conclusion that the initial stop of the vehicle in which Mr. Allgier was a passenger was justified: Trooper Tegdesth had reasonable suspicion to stop Mr. Maestas's car for following too closely. Therefore, the initial stop did not violate the Fourth Amendment to the United States Constitution. Further, the subsequent search of Mr. Allgier's jacket was supported by the community caretaker exception to the warrant requirement. Accordingly, the search of Mr. Allgier's jacket did not violate the Fourth Amendment to the United States Constitution. Affirmed.