# IN THE SUPREME COURT, STATE OF WYOMING

## 2019 WY 125

### OCTOBER TERM, A.D. 2019

December 12, 2019

BRYAN ROBINSON,

Appellant
(Defendant),

v.

S-19-0039

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Laramie County*
The Honorable Steven K. Sharpe, Judge

*Representing Appellant:*
Mitch Guthrie, Cheyenne, Wyoming.

*Representing Appellee:*
Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Benjamin Fischer, Assistant Attorney General.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]     Appellant Bryan Robinson pleaded guilty to possession of more than three ounces of marijuana and verbally reserved the right to appeal the district court's denial of his motion to suppress the evidence obtained from the search of his vehicle.  Written conditional plea agreements are typically required; however, under the unique circumstances of this case, we exercise our discretion to review the verbally-reserved issue. On the merits, we affirm the district court's denial of Mr. Robinson's motion to suppress.

## ISSUES

[¶2]     The issues on appeal are:

1.      Did Mr. Robinson enter a proper conditional guilty plea?

2.      Did the district court err by denying Mr. Robinson's motion to suppress which was based upon his claim the trooper violated his Fourth Amendment rights?

a.      Did the trooper have reasonable suspicion to stop Mr. Robinson for following another vehicle too closely?

b.      Did the trooper have reasonable suspicion that Mr. Robinson was in possession of illegal controlled substances to justify extending the duration of the stop for a drug-dog sniff of Mr. Robinson's car?

## FACTS

[¶3]     Shortly after 10 a.m. on December 28, 2017, Wyoming Highway Patrol Trooper Shane Carraher observed Mr. Robinson driving a red Chevrolet Camaro eastbound on Interstate 80 in Laramie County, Wyoming.  Mr. Robinson was driving below the speed limit; but, when he saw the trooper's patrol car, he tapped his brakes to slow down further. Trooper Carraher began following Mr. Robinson and turned on his video recorder as he approached the car.  The trooper noticed the car's sunroof was open even though the temperature was around 32 degrees.  Mr. Robinson drove up behind a semi-truck, and Trooper Carraher used a stopwatch to calculate how closely Mr. Robinson was following the truck.  Based upon his measurements, Trooper Carraher stopped Mr. Robinson for following the truck too closely.

[¶4]     Trooper Carraher approached Mr. Robinson's car and spoke with him through the passenger-side window.  The trooper said he was going to issue Mr. Robinson a warning for following another vehicle too closely and requested his documentation.  Mr. Robinson said the car was a rental and the rental agreement was on his cell phone.  When Mr. Robinson handed over his driver's license, Trooper Carraher noticed his hand was shaking.

1

Trooper Carraher also saw snack food, energy drinks, water, trash, and a backpack on the front passenger floorboard of Mr. Robinson's car.

[¶5]     Trooper Carraher asked Mr. Robinson to accompany him to the patrol car while he completed the warning.  The rental agreement showed Mr. Robinson had rented the car on December 26, 2017, in Las Vegas, Nevada, and he was supposed to return it there on December 27, 2017.  When the trooper questioned him about his travel plans, Mr. Robinson explained he was going to Kansas City to participate in a dance competition on December 29, 2017.  Mr. Robinson indicated he planned to leave the car in Kansas City, pay the fees associated with returning the car late and failing to return it to Las Vegas, and fly back to Las Vegas.  Trooper Carraher asked why he did not fly to the competition, and Mr. Robinson said he decided to go to Kansas City at the last minute and airfare was too expensive.  Mr. Robinson showed Trooper Carraher a flyer for the dance competition which said it was to be held on December 30, 2017, rather than December 29, 2017.

[¶6]     Trooper Carraher asked Mr. Robinson whether he was on probation or parole and whether he had been arrested or cited for any drug crimes.  Mr. Robinson answered, "No," to these questions.  The trooper obtained Mr. Robinson's criminal history report from dispatch, which showed Mr. Robinson had previously been cited for misdemeanor possession of marijuana.  Trooper Carraher suspected Mr. Robinson was transporting controlled substances and detained him for a drug-dog sniff of the car.  The dog alerted on Mr. Robinson's car, and a subsequent search yielded approximately ten pounds of marijuana.

[¶7]     The State charged Mr. Robinson with two counts—possession with intent to deliver marijuana (Count I) and possession of more than three ounces of marijuana (Count II).  Wyo. Stat. Ann. § 35-7-1031(a)(ii) and (c)(iii) (LexisNexis 2019).  Mr. Robinson filed a motion to suppress the evidence seized during the search of his car.  After a hearing, the district court denied the motion to suppress.  Mr. Robinson subsequently pleaded guilty to possession of more than three ounces of marijuana in exchange for the State's agreement to dismiss the other count.  The district court sentenced him to two to four years in prison, suspended the sentence, and ordered him to serve three years of supervised probation.  This appeal followed.

**DISCUSSION**

**1.  Conditional Guilty Plea**

[¶8]     The State and Mr. Robinson executed a written plea agreement, but it did not state Mr. Robinson's guilty plea was conditional.  The discussion at Mr. Robinson's change of plea hearing demonstrated the parties had agreed otherwise.

THE COURT: . . . I've just been handed a copy of the plea agreement by [defense counsel]. I would ask [defense counsel], if he doesn't mind, to summarize what the plea agreement is in this case.

[DEFENSE COUNSEL]: Thank you, Your Honor. In exchange for a plea of guilty to Count II of the Information, possession of marijuana, a felony, the party will -- the State is going to be recommending a two – to four-year sentence in favor of a three-year period of supervised probation.
. . .
Count I would be dismissed. Mr. Robinson would have the right to appeal the ruling on the suppression of evidence. And if he were to prevail on that appeal then . . .

THE COURT: So[,] is it a conditional plea you're contemplating?

[DEFENSE COUNSEL]: It is. Thank you.

[¶9] After reviewing other provisions of the plea agreement with Mr. Robinson, the district court stated:

THE COURT: [T]he other thing I wanted to talk to you about, Mr. Robinson, it is a little bit different, a conditional plea. And I'm sure you've discussed this with [defense counsel]. So[,] we had the suppression hearing in your case some time ago. The Court denied the motion to suppress. I understand that you are reserving the right to appeal that to the appellate court. . . .

[I]f my ruling is reversed and the Court decides that the evidence should be suppressed, you would be allowed to withdraw your plea. Do you understand that?

[MR. ROBINSON]: Yes, Your Honor.

[¶10] Mr. Robinson pleaded guilty and provided a factual basis for his plea; the district court accepted his plea. The court then asked if anything else needed to be addressed at the hearing, to which the prosecutor responded:

[PROSECUTOR]: I'll say the written language [of the plea agreement] doesn't show that conditional plea, Your

3

Honor. I was just going to go with [defense counsel], and we'll file an amended plea agreement to reflect that, Your Honor.

THE COURT: I think that's important that you do that. It seems like there is an appellate court case that addressed that issue. . . . [I]t is probably best if you can get it in writing.

[PROSECUTOR]: Yes, Your Honor. I just wanted to reflect that, according to that case law, both parties have to agree to that and so does the Court have to accept a conditional plea.

THE COURT: I'm certainly willing to accept a conditional plea.

[PROSECUTOR]: And I, as the State's representative, agree to the conditional plea just for the record, Your Honor.
. . .
[DEFENSE COUNSEL]: So[,] we'll go ahead and follow that up just to make sure that the record is perfect. Thank you, everyone, and thank you, [prosecutor], for allowing a conditional plea. Really generous. Thank you.

[¶11] The plea agreement was never revised to reflect the conditional plea, and the State argues on appeal that Mr. Robinson's conditional plea did not comply with Wyoming Rule of Criminal Procedure 11(a)(2) because it did not reserve in writing a specific issue for appeal. Rule 11(a)(2) states:

(2) Conditional Pleas. – With the approval of the court and the consent of the attorney for the state, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, to seek review of the adverse determination of any specified pretrial motion. A defendant who prevails on appeal shall be allowed to withdraw the plea.

[¶12] Under Rule 11(a)(2), reservation of the right to appeal a specific issue must be in writing, the State must consent to the plea, the district court must approve the plea, and the issue reserved must be dispositive. *Matthews v. State,* 2014 WY 54, ¶ 15, 322 P.3d 1279, 1281 (Wyo. 2014). Although the rule requires the reservation be in writing, we recognized in *Walters v. State,* 2008 WY 159, ¶ 14, 197 P.3d 1273, 1277 (Wyo. 2008):

4

While strict conformance with the writing requirement is the best practice, some federal courts have determined that it is not mandatory. *E.g., United States v. Yasak,* 884 F.2d 996, 1000 (7th Cir.1989); *United States v. Bell,* 966 F.2d 914, 916-17 (5th Cir.1992). Without a writing, those courts require that the record sufficiently demonstrate that the defendant intended to preserve the right to appeal a specific issue or issues. *See, e.g., United States v. Mastromatteo,* 538 F.3d 535, 542-44 (6th Cir.2008); *Yasak,* 884 F.2d at 1000.

[¶13]   In *Yasak,* 884 F.2d at 999, the Seventh Circuit explained the purpose of the writing requirement in the comparable Federal Rule of Criminal Procedure 11(a)(2):

[The purpose of requiring a written] reservation of the right to appeal from [an adverse determination of] a specified . . . pretrial motion is to ensure that careful attention will be paid to any conditional plea. Fed.R.Crim.P. 11, Notes of Advisory Committee on Rules, 1983 Amendment. It also identifies precisely what pretrial issues have been preserved for appellate review. *Id.* And the added step will further prevent entry of a conditional plea "without the considered acquiescence of the government." *Id.* . . . Finally, the rule ensures that conditional pleas will be allowed only when the appellate court's decision will completely dispose of the case. Notes of Advisory Committee, 1983 Amendment; *see also United States v. Wong Ching Hing,* 867 F.2d 754, 758 (2d Cir.1989).

[¶14]   The writing requirement is not jurisdictional, and other evidence in the record can fulfill the intent and purposes of the Rule 11(a)(2) requirements.  *Id.* at 999-1000; *United States v. Markling,* 7 F.3d 1309, 1313 (7th Cir. 1993).  In *Yasek,* 884 F.2d at 1000, the transcript took the place of a written agreement, and in *Markling,* 7 F.3d at 1313-14, a letter from the prosecutor setting out the terms of the conditional plea satisfied the requirements of Federal Rule of Criminal Procedure 11(a)(2).  *See also,* 9 Fed. Proc. L. Ed. § 22:940 (2019) (a conditional guilty plea may be valid under Fed. R. Crim. P. 11(a)(2) absent a writing if the record reveals the plea was conditioned on the right to appeal a specific issue, the government and trial court approved the conditional plea, and the appellate issue is dispositive).

[¶15]   Consistent with the federal authority discussed in *Walters,* this Court has not strictly enforced the writing requirement.  In *Faubion v. State,* 2010 WY 79, ¶ 15, 233 P.3d 926, 929 (Wyo. 2010), we exercised our discretion to address an issue reserved in a conditional plea even though it was not in writing and "other requirements of [Rule 11(a)(2)] were not precisely followed" because the record was clear that the district court and the parties

5

agreed to a conditional plea and understood the issue reserved for appeal. *See also*, Rule 11(h) ("Any variance from the procedures required by this rule which does not affect substantial rights shall be disregarded."); *United States v. Bell*, 966 F.2d 914, 916 (5th Cir. 1992) (under Fed. R. Crim. P. 11(h), an appellate court can excuse strict compliance with the Rule 11(a)(2) requirements if the error is harmless).

[¶16]   *Sutton v. State*, 2009 WY 148, ¶ 8 n.2, 220 P.3d 784, 787 n.2 (Wyo. 2009), is another case where we reviewed the issue reserved in a conditional guilty plea even though the requirements of Rule 11(a)(2) were not met.   The written plea agreement did not state Mr. Sutton was reserving his right to appeal the denial of his suppression motion and there was no indication the State expressly agreed to the conditional plea.   *Id.*   Nevertheless, we exercised our discretion to consider Mr. Sutton's appeal because the record was clear he reserved the right to appeal the denial of his motion to suppress, the parties did not challenge the conditional nature of the plea, and the reserved issue was dispositive.   *Id.*

[¶17]   The State seems to argue that a written plea agreement is crucial in this case to identify the issue(s) Mr. Robinson reserved for appeal.   The transcript of the change of plea hearing plainly shows Mr. Robinson reserved his right to appeal the district court's denial of his motion to suppress.   We have considered conditional pleas which simply reserved the right to appeal the denial of a motion to suppress on a number of occasions.   *See id. See also*, *Gibson v. State*, 2019 WY 40, ¶¶ 6-7, 438 P.3d 1256, 1258 (Wyo. 2019); *Rodriguez v. State*, 2018 WY 134, ¶ 14, 430 P.3d 766, 770 (Wyo. 2018); *Maestas v. State*, 2018 WY 47, ¶ 5, 416 P.3d 777, 780 (Wyo. 2018).   The transcript also clearly shows the State and the district court understood and agreed Mr. Robinson was entering a conditional plea reserving the right to appeal from the denial of his motion to suppress.   In fact, the prosecutor committed to work with defense counsel to provide a written plea agreement reflecting the conditional plea.   Finally, there is no dispute that a reversal of the district court's decision on the suppression motion would be dispositive.   Although a written plea agreement including an express reservation of the right to appeal a particular issue is always preferable, the requirements of Rule 11(a)(2) are satisfied under the unique circumstances of this case by the transcript, and we exercise our discretion to address Mr. Robinson's appeal.

[¶18]   As to the State's concern about what arguments Mr. Robinson may make on appeal, our precedent is well-established that only arguments made to the district court may be presented on appeal.   "A conditional plea of guilty does not provide *carte blanche* permission for the appellant to present any and all arguments on appeal.   An appellant may only raise arguments that were clearly presented to the district court."   *Tibbetts v. State*, 2017 WY 9, ¶ 12, 388 P.3d 517, 520-21 (Wyo. 2017) (internal citations and quotation marks omitted).

[¶19]   Mr. Robinson presents three arguments on appeal in support of his claim the district court erred by denying his motion to suppress:  1) Trooper Carraher's pursuit of him on I-

80 violated the Fourth Amendment; 2) Trooper Carraher did not have reasonable suspicion to stop him for following the semi-truck too closely; and 3) Trooper Carraher improperly extended the duration of the stop for the drug-dog sniff. Mr. Robinson did not raise the first argument in his motion to suppress. The district court considered only the second and third assertions. We follow suit and refuse to consider Mr. Robinson's argument that Trooper Carraher violated his Fourth Amendment rights by following him. Our analysis will, therefore, focus on whether the trooper's actions during the initial stop and in extending the detention for the drug-dog sniff violated Mr. Robinson's rights under the Fourth Amendment.

## 2. Motion to Suppress for Violation of Fourth Amendment Rights

[¶20] Mr. Robinson claims the district court erred by denying his motion to suppress the evidence discovered during the search of his car. When reviewing the district court's denial of a motion to suppress, this Court views "the evidence in the light most favorable to the district court's determination and defer[s] to the district court's factual findings unless they are clearly erroneous." *Jennings v. State,* 2016 WY 69, ¶ 8, 375 P.3d 788, 790 (Wyo. 2016). We defer to the district court's findings because it has "the opportunity to hear the evidence, assess witness credibility, and draw the necessary inferences, deductions, and conclusions[.]" *Flood v. State,* 2007 WY 167, ¶ 10, 169 P.3d 538, 542 (Wyo. 2007) (quoting *O'Boyle v. State,* 2005 WY 83, ¶ 18, 117 P.3d 401, 407 (Wyo. 2005)). The underlying question of law—whether the search was unreasonable and therefore unconstitutional—is reviewed *de novo. Jennings,* ¶ 8, 375 P.3d at 790.

### a. Initial Stop

[¶21] The Fourth Amendment to the United States Constitution protects citizens from unreasonable searches and seizures. Fourth Amendment jurisprudence recognizes three tiers of interaction between law enforcement and citizens: consensual encounter, investigatory detention and arrest. *Tibbetts,* ¶ 13, 388 P.3d at 521 (citing *Dimino v. State,* 2012 WY 131, ¶ 10, 286 P.3d 739, 742 (Wyo. 2012)). *See also, Flood,* ¶ 14, 169 P.3d at 543-44. The interaction between Mr. Robinson and Trooper Carraher began as a traffic stop, which is an investigatory detention. *Flood,* ¶¶ 14-15, 169 P.3d at 543-44. Because the occupants of a vehicle are "seized" during a traffic stop, the trooper's actions must be reasonable under the Fourth Amendment. *Kennison v. State,* 2018 WY 46, ¶¶ 13-14, 417 P.3d 146, 149-50 (Wyo. 2018); *Allgier v. State,* 2015 WY 137, ¶ 14, 358 P.3d 1271, 1276 (Wyo. 2015).

[¶22] To justify a traffic stop, the trooper must have "reasonable suspicion—that is, a particularized and objective basis" to suspect the motorist is violating the law. *Allgier,* ¶ 14, 358 P.3d at 1276 (quoting *Heien v. North Carolina,* 574 U.S. 54, 60, 135 S.Ct. 530, 536, 190 L.Ed.2d 475 (2014)) (internal quotation marks and other citations omitted). The trooper's conduct is judged by "'an objective standard which takes into account the totality

of the circumstances.'" *Meadows v. State,* 2003 WY 37, ¶ 17, 65 P.3d 33, 37 (Wyo. 2003) (quoting *Putnam v. State,* 995 P.2d 632, 637 (Wyo. 2000)). "[W]hile the test is objective, the [trooper]'s training, experience, and expertise are to be considered as part of the totality of the circumstances." *Maestas,* ¶ 13, 416 P.3d at 782 (quoting *Speten v. State,* 2008 WY 63, ¶ 4, 185 P.3d 25, 27 (Wyo. 2008)) (emphasis, internal quotation marks, and other citations omitted).

[¶23] The district court concluded the stop was proper because Trooper Carraher had reasonable suspicion Mr. Robinson was following another vehicle too closely, in violation of Wyo. Stat. Ann. § 31-5-210(a) (LexisNexis 2019). Section 31-5-210(a) states: "The driver of a vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway."

[¶24] Trooper Carraher testified that he determined Mr. Robinson was following the semi-truck too closely using the two-second rule. The two-second rule generally requires that a driver stay far enough behind the vehicle he is following so at least two seconds elapse between the times the vehicles pass a fixed point. *See generally, United States v. White,* 584 F.3d 935, 946 (10th Cir. 2009) (quoting a trooper's explanation of the two-second rule as: "When you're following another vehicle, you should be approximately two seconds behind [it] and - in other words, once car A hits a certain point, car B should hit . . . that same point in about two seconds.").

[¶25] Trooper Carraher testified he used a stopwatch to measure the time between when the semi-truck passed a mark on the road and when Mr. Robinson's car passed the same mark. He performed the measurement twice, and each time the result was less than two seconds—1.1 seconds and 0.89 seconds, respectively. Trooper Carraher stated he was trained to use the two-second rule by the Wyoming Highway Patrol. He explained: "I was trained that the average natural perception and reaction time, so the time that someone can perceive and react, is 1.5 seconds. So[,] they gave an additional half second and say a safe distance was two seconds." Trooper Carraher testified he believes the two-second rule is more accurate than other methods of calculating following distances.

[¶26] The district court found Trooper Carraher's testimony credible, and Mr. Robinson does not dispute the district court's credibility determination. Instead, he claims the two-second rule is not appropriate in this case because, taking into account the specific stopping distances of the Camaro and the semi-truck,[1] he had ample time to stop even if his car and the semi-truck were less than two seconds apart.

---

[1] Mr. Robinson cites two websites as evidence of the stopping distances of the semi-truck and his car. We need not delve into whether this evidence was proper because the trooper used the two-second rule which is an appropriate means of measuring Mr. Robinson's following distance.

[¶27]   This Court discussed the two-second rule in *Allgier,* ¶ 18 n.2, 358 P.3d at 1277 n.2. Relying on *United States v. Hunter,* 663 F.3d 1136, 1142-43 (10th Cir. 2011), we stated "the two second rule of thumb is . . . an appropriate method for determining whether a vehicle is following at a reasonable distance." *See also, United States v. Nichols,* 374 F.3d 959, 965 (10th Cir. 2004), *cert. granted and opinion vacated to allow resentencing under United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005); *opinion reinstated,* 410 F.3d 1186 (10th Cir. 2005) (discussing the use of the two-second rule to establish reasonable suspicion for a traffic stop for following too closely).   One of the benefits of the two-second rule is that it provides a simple method for calculating following distances without having to account for other factors, such as the speed of the vehicles or the estimated number of car lengths between the vehicles.  *Allgier,* ¶ 18 n.2, 358 P.3d at 1277 n.2.  Mr. Robinson's attempt to show he was not following the semi-truck too closely by using the specific stopping distances of the semi-truck and his car is far more complicated than the two-second rule.  Mr. Robinson's method would require the trooper to determine the make, model and year of the vehicles and then research the stopping distances of those vehicles.  It is clear from *Allgier, Hunter* and *Nichols* that an officer can develop reasonable suspicion that a driver is following another vehicle too closely without resorting to such a complex method.

[¶28]   Mr. Robinson also asserts *Phelps v. State,* 2012 WY 87, 278 P.3d 1148 (Wyo. 2012), and *Yoeuth v. State,* 2009 WY 61, 206 P.3d 1278 (Wyo. 2009), set out the proper standard for reasonable suspicion to stop a driver for following too closely.  He claims those cases require a showing that the distance between the two vehicles was one car length or less, there was no apparent reason for the driver to follow the other vehicle so closely, there was ample room to pass, and the officer observed the infraction for an extended period of time.

[¶29]   In *Phelps,* ¶ 21, 278 P.3d at 1154, we held the trooper was justified in stopping the car Mr. Phelps was riding in because it followed two semi-trucks by less than one car length for approximately a quarter of a mile.  In its decision letter, the district court also remarked the car could have passed and there was no apparent reason for it to follow the trucks so closely, *id.,* ¶ 20, 278 P.3d at 1154, but we did not mention those factors in our discussion of the evidence.  *Id.,* ¶ 21, 278 P.3d at 1154.  We concluded, in *Yoeuth,* the trooper was justified in initiating a stop because Ms. Yoeuth's vehicle was following another vehicle by less than one car length for approximately one-half mile.  *Id.,* ¶¶ 5, 19, 206 P.3d at 1281, 1283.  *Phelps* and *Yoeuth* do not establish the quintessential test for determining a trooper has reasonable suspicion[2] of a violation of § 31-5-210(a).  Instead, those cases and *Allgier* demonstrate there are various ways a law enforcement officer can develop reasonable suspicion that a vehicle is following too closely.  *See Hunter,* 663 F.3d at 1143 (noting

---

[2] We determined in *Phelps* and *Yoeuth* that the troopers had probable cause to make the stops, which is a higher standard than reasonable suspicion.  *Phelps,* ¶ 23, 278 P.3d at 1154-55; *Yoeuth,* ¶ 20, 206 P.3d at 1283.  Since then, we have recognized that, under *Heien,* 574 U.S. at 60, 135 S.Ct. at 536, a traffic stop need only be supported by reasonable suspicion to satisfy the requirements of the Fourth Amendment. *Allgier,* ¶ 14, 358 P.3d at  1276.

different ways of establishing a vehicle is following too closely). The two-second rule is one of those ways. *Id.; Allgier, ¶* 18 n.2, 358 P.3d at 1277 n.2.

[¶30]  In this case, the district court correctly ruled Trooper Carraher developed reasonable suspicion, i.e., "a particularized and objective basis for suspecting," that Mr. Robinson was following the semi-truck too closely by using the two-second rule to measure the distance between the two vehicles multiple times. *Allgier, ¶* 14, 358 P.3d at 1276 (internal quotation marks and citation omitted); *Nichols,* 374 F.3d at 965. Consequently, Mr. Robinson was not seized in violation of the Fourth Amendment when Trooper Carraher stopped him for following another vehicle too closely under § 31-5-210(a).

### b. Detention

[¶31]  Detention during a traffic stop "must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification." *Flood, ¶* 16, 169 P.3d at 544 (citation omitted). The law enforcement officer "may request a driver's license, proof of insurance and vehicle registration, run a computer check, and issue a citation.'" *Gibson, ¶* 10, 438 P.3d at 1258 (quoting *Harris v. State*, 2018 WY 14, ¶ 17, 409 P.3d 1251, 1254 (Wyo. 2018) (other citations omitted)). We have indicated the "computer check" can include a criminal history check. *See Gibson,* ¶¶ 4, 10, 438 P.3d at 1257-58. *See also, United States v. Lyons,* 510 F.3d 1225, 1235 (10th Cir. 2007) (after a proper traffic stop, the officer may request the driver's license and vehicle registration, run a criminal history check, and issue a warning or citation). The officer may also inquire into the motorist's travel plans to put the traffic violation in context. *Ray v. State,* 2018 WY 146, ¶ 19, 432 P.3d 872, 877 (Wyo. 2018) (citing *O'Boyle*, ¶ 48, 117 P.3d at 414).

[¶32]  Once the tasks associated with the original traffic stop "are completed, a driver must be allowed to proceed on his way unless reasonable suspicion exists that the driver is engaged in [other] criminal activity or the driver consents to additional questioning." *United States v. Guerrero-Espinoza,* 462 F.3d 1302, 1307 (10th Cir. 2006) (citation omitted). *See also, Gibson,* ¶ 10, 438 P.3d at 1258 (stating "[g]enerally, the driver must be allowed to proceed on his way without further delay once the officer determines the driver has a valid driver's license and is entitled to operate the vehicle") (citation omitted); *Dimino,*¶ 10, 286 P.3d at 742 (A law enforcement officer may extend the duration of an investigatory detention only if the individual "consents to the expanded detention or if there exists an objectively reasonable suspicion that [other] criminal activity has occurred or is occurring.") (internal quotation marks and citation omitted).

[¶33]  Mr. Robinson asserts Trooper Carraher improperly detained him after the original

purpose of the stop had concluded to allow for a drug-dog sniff.[3] In determining whether an officer had reasonable suspicion to extend the detention, we consider "the totality of the circumstances and how those circumstances developed during the officer's encounter" with the motorist. *Flood,* ¶ 22, 169 P.3d at 545 (citing *Custer v. State,* 2006 WY 72, ¶ 20, 135 P.3d 620, 626 (Wyo. 2006)).

[¶34] The district court addressed the expanded detention, as follows:

> The question is whether the facts and circumstances that Trooper Carraher learned during this time gave rise to separate reasonable suspicion that Mr. Robinson was engaged in further criminal activity. The court concludes that [they] did.
>
> When Trooper Carraher first observed Mr. Robinson's car, he noted that Mr. Robinson engaged the brakes even though he was ostensibly driving under the speed limit. Then, Trooper Carraher noticed the sun roof was [open] despite the 30-degree weather. Once Trooper Carraher pulled over Mr. Robinson, he observed evidence of "hard travel," which this court understood to mean that Trooper Carraher believed Mr. Robinson had been in the car for an extended period with little rest or stopping.
>
> Once in the patrol car, Trooper Carraher learned that Mr. Robinson's car was a rental that he rented in Las Vegas and that it was overdue. But, not only was it overdue, the rental agreement showed that Mr. Robinson was required to return the car in Las Vegas the day after he had rented it. Yet, Mr. Robinson [said he] had rented the car on December 26, 2017, to drive to a dance competition in Kansas City that he claimed was scheduled for December 29, 2017, but was actually on December 30, 2017. Moreover, despite the rental agreement's terms, Mr. Robinson planned to return the car in Kansas City and fly back to Las Vegas to save some money on airfare, notwithstanding the extra fee he would have to pay to drop it off in Kansas City. During the stop, Trooper Carraher noticed that Mr. Robinson had "labored breathing."

---

[3] Mr. Robinson broadly declares that the length of time Trooper Carraher detained him to issue the warning was "objectively unreasonable" and a "ruse" to continue questioning him and allow the K-9 officer to arrive. He does not, however, support his argument with cogent argument or citations to pertinent authority or the record. *Wright v. State,* 2019 WY 49, ¶¶ 8-9, 440 P.3d 1092, 1094 (Wyo. 2019). Therefore, we will not further discuss this argument.

Adding to these facts, Trooper Carraher, on two occasions, asked Mr. Robinson if he had ever been arrested or cited for anything. Mr. Robinson denied that he had. Once Trooper Carraher received Mr. Robinson's criminal history from his dispatch, however, he discovered that Mr. Robinson had been arrested for misdemeanor possession of marijuana three years earlier. Trooper Carraher combined the evidence of "hard travel," the oddities concerning the rental car, the date of the dance competition, and Mr. Robinson's decision to lie about his criminal history to conclude that Mr. Robinson was engaged in further criminal activity.

After considering the totality of the circumstances, the district court concluded Trooper Carraher had reasonable suspicion Mr. Robinson was involved in further criminal activity which justified detaining him for a drug-dog sniff of his vehicle.

[¶35] The record supports the district court's factual findings. Indeed, Mr. Robinson does not claim the findings are clearly erroneous. He argues, instead, that each circumstance was innocent and, together, they do not create reasonable suspicion he was committing other crimes. We explained in *Garvin v. State,* 2007 WY 190, ¶ 16, 172 P.3d 725, 730 (Wyo. 2007):

The Supreme Court has instructed that we not examine each factor adding up to reasonable suspicion individually, but that we evaluate how convincingly they fit together into a cohesive, convincing picture of illegal conduct. In [*United States v.*] *Arvizu,* [534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) ], the Court rejected what is called a "divide-and-conquer analysis," noting that reasonable suspicion may exist even if "each observation" is "susceptible to an innocent explanation." *Arvizu,* 534 U.S. at 274, 122 S.Ct. 744.

(other citation omitted). We will, therefore, consider how the factors relied upon by the district court fit together to determine if they established reasonable suspicion.

[¶36] Some of the factors mentioned by the district court have no significance. The district court found that Mr. Robinson had "labored breathing." Trooper Carraher indicated Mr. Robinson seemed nervous because his hand shook slightly when he handed over his driver's license and because his breathing was labored while he was in the patrol vehicle.[4]

---

[4] The trooper also testified he could "see a visible pulse on [Mr. Robinson's] stomach." He did not explain that observation in detail and, having watched the video of the traffic stop, we cannot understand how the trooper could have observed a pulse in Mr. Robinson's stomach given he was fully clothed during the encounter.

Generic nervousness is to be expected when a person is stopped by law enforcement and, therefore, has little weight in the reasonable suspicion analysis. *Flood,* ¶ 27, 169 P.3d at 546. However, numerous signs of significant anxiety which do not dissipate during the stop or increased nervousness when discussing certain matters with the trooper will be given some weight in determining if reasonable suspicion supports continued detention of a motorist. *See, e.g., Dimino,* ¶¶ 20-21, 286 P.3d at 744-45 (many signs of anxiety, including sweating and asking to roll down the windows on a cold day, hesitating before answering questions, touching the face which is a sign of deceit, a pulsing carotid artery, and tears in the eyes consistent with an adrenaline dump, were significant enough to warrant some weight in the reasonable suspicion analysis); *Garvin,* ¶ 17, 172 P.3d at 730 (signs of nervousness and evasion when the officer asked questions about controlled substances were pertinent to the reasonable suspicion analysis). Although the district court mentioned Mr. Robinson's labored breathing, it does not appear the court gave much, if any, weight to Mr. Robinson's nervousness in its reasonable suspicion analysis. We, likewise, do not assign any weight to the limited signs that Mr. Robinson was nervous.

[¶37] The district court also mentioned Mr. Robinson was driving with the sunroof open. The trooper testified he found the open sunroof unusual because of the cold temperature, but he did not explain how that factored into his suspicion that Mr. Robinson had controlled substances in the car. Therefore, we do not assign any weight to that finding.

[¶38] Trooper Carraher testified he saw snacks, energy drinks, water, trash, and a backpack on the front passenger-side floorboard of Mr. Robinson's car, which he considered evidence of "hard travel." The district court interpreted that to mean Mr. Robinson had driven for an extended period with little rest or stopping. In general, the presence of food, trash or luggage in a vehicle adds little to the reasonable suspicion analysis. *Damato v. State,* 2003 WY 13, ¶ 25, 64 P.3d 700, 710 (Wyo. 2003) (citing *United States v. Wood,* 106 F.3d 942, 947 (10th Cir. 1997)). However, the evidence in this case went beyond Trooper Carraher's observation of those items in the car. Mr. Robinson actually told Trooper Carraher that, since leaving Las Vegas, he had only stopped for a short time in Utah to sleep in his car. Evidence that a motorist has driven a long distance in a short amount of time can contribute to an officer's reasonable suspicion of a controlled substance violation. *Flood,* ¶¶ 33-35, 169 P.3d 547-48.

[¶39] The rental agreement and Mr. Robinson's travel plans played a significant role in the district court's analysis. Mr. Robinson rented the car for one day in Las Vegas on December 26, 2017, and it was supposed to be returned in Las Vegas on December 27, 2017. Nevertheless, Mr. Robinson was driving the car in Wyoming on December 28, 2017. Mr. Robinson said he intended to talk to the rental company about his change of plans, but had not yet done so. Mr. Robinson also told the trooper he planned to drop the car off in Kansas City, pay the extra fees, and fly back to Las Vegas. When Trooper Carraher asked why he did not fly to Kansas City, Mr. Robinson explained that driving was "simpler" and

13

less expensive since he had decided at the last minute to go to Kansas City for the dance competition.

[¶40] "[A] rental agreement that contradicts or is somehow inconsistent with the traveler's plans is an appropriate consideration in a reasonable suspicion analysis." *Sutton,* ¶ 18, 220 P.3d at 790 (citing *Feeney v. State,* 2009 WY 67, ¶ 21, 208 P.3d 50, 56-57 (Wyo. 2009), and *Garvin,* ¶¶ 15-17, 172 P.3d at 729-30). The obvious contradictions between the rental agreement and Mr. Robinson's travel plans contribute to the reasonable suspicion in this case. Additionally, Mr. Robinson's change of plans would result in him renting the car for a one-way trip. We have recognized that one-way rental vehicles are often used to transport illegal drugs. *See Feeney,* ¶ 21, 208 P.3d at 56-57. Mr. Robinson's statement that his plan to rent a car, pay additional fees for not complying with the rental agreement, and purchase a one-way ticket to Las Vegas was less expensive than flying round-trip to Kansas City was also suspicious.

[¶41] Furthermore, Mr. Robinson told Trooper Carraher multiple times that the dance competition was on Friday, December 29, 2017, but the flyer for the competition which Mr. Robinson showed to the trooper stated it was on December 30, 2017. Trooper Carraher and the district court found Mr. Robinson's story about his travel plans suspicious, and so do we. In general, "'unusual or inconsistent travel plans are a proper consideration in a reasonable suspicion analysis.'" *Frazier v. State,* 2010 WY 107, ¶ 21, 236 P.3d 295, 302 (Wyo. 2010) (quoting *Sutton*, ¶ 19, 220 P.3d at 790). It was not unreasonable for Trooper Carraher to suspect Mr. Robinson rented the car to transport controlled substances to Kansas City and then planned to fly back to Las Vegas after the delivery.

[¶42] The district court also found Mr. Robinson's criminal history and his lack of truthfulness about it contributed to Trooper Carraher's reasonable suspicion that Mr. Robinson was engaged in further criminal activity. The trooper asked Mr. Robinson whether he was on probation or parole or had ever been arrested, and he said, "No," to each question. Mr. Robinson's criminal history showed a prior misdemeanor citation for possession of controlled substances, so Trooper Carraher asked Mr. Robinson if he had ever been cited for any drug offenses. Mr. Robinson again said, "No." This exchange was important for two reasons. First, "[a]lthough a suspect's criminal history cannot, by itself, establish reasonable suspicion, it is one factor that may justify further detention." *Pier v. State,* 2019 WY 3, ¶ 30, 432 P.3d 890, 899 (Wyo. 2019) (citing *United States v. Simpson,* 609 F.3d 1140, 1147 (10th Cir. 2010)). Additionally, Mr. Robinson lied about his criminal history. A false answer to an officer's question can contribute to an officer's reasonable suspicion that "criminal activity [is] afoot." *Id.,* ¶ 27, 432 P.3d at 898; *Negrette v. State,* 2007 WY 88, ¶ 23, 158 P.3d 679, 685 (Wyo. 2007).

[¶43] Any one of these circumstances, alone, may be consistent with innocent conduct. However, when considered together and in relation to one another, Mr. Robinson's limited stops while driving from Las Vegas to Kansas City, the overdue rental agreement, his intent

14

to use the rental car to travel one-way to Kansas City, his inconsistent travel plans, his criminal history, and his deceit about his criminal history are sufficient to show Trooper Carraher had reasonable suspicion Mr. Robinson was committing a crime involving controlled substances. The district court properly denied the motion to suppress because Trooper Carraher did not violate Mr. Robinson's Fourth Amendment rights by detaining him for a drug-dog sniff of his vehicle.

[¶44] Affirmed.