# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 132

OCTOBER TERM, A.D. 2020

October 15, 2020

RYAN SCOTT SIMMONS,

Appellant
(Defendant),

v.

S-20-0083

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Carbon County*
*The Honorable Dawnessa A. Snyder, Judge*

*Representing Appellant:*
    Office of the Public Defender: Diane M. Lozano, Wyoming Public Defender; Kirk A. Morgan, Chief Appellate Counsel; David E. Westling, Senior Assistant Appellate Counsel.

*Representing Appellee:*
    Bridget L. Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Timothy P. Zintak, Assistant Attorney General.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]   Ryan Scott Simmons was convicted of three felonies after law enforcement officers found methamphetamine in his truck: possession, possession with intent to deliver, and conspiracy to deliver.  On appeal, Mr. Simmons contends the district court erroneously denied his motion to suppress because the initial traffic stop was not justified.  We affirm.

### *ISSUE*

[¶2]   Did the district court err when it denied Mr. Simmons' motion to suppress?

### *FACTS*

[¶3]   In February 2019, Wyoming Division of Criminal Investigation agents gathered information indicating Mr. Simmons was selling methamphetamine in Carbon County, Wyoming and that his source was in Denver, Colorado.  On February 24, agents installed a GPS tracking device on his truck.[1]  On February 27, the tracking device indicated the truck traveled from Rawlins to Laramie and then to Denver.  On February 28, the tracking device indicated the truck was returning to Wyoming.

[¶4]   Suspecting the occupants may be transporting controlled substances, Agent Ford contacted Wyoming Highway Patrol Lieutenant Kelly Finn and Trooper Aaron Kirlin and briefed them on the investigation.  He requested that the troopers conduct "a wall stop" if the driver committed a traffic violation in Carbon County.  While one trooper conducted the traffic stop, another should immediately deploy a canine around the truck's exterior.  Trooper Kirlin, a canine handler, passed this information along to Trooper Caleb Hobbs and they parked their separate patrol cars on the Interstate 80 median in Carbon County to watch for the truck.

[¶5]   That afternoon, Troopers Hobbs and Kirlin spotted the truck and observed a crack in the front windshield.  Trooper Hobbs pulled onto the interstate and initiated a traffic stop.  He identified the driver as Jessica Nadeau and requested she accompany him to his patrol car so that he could write her a warning.  Mr. Simmons waited in the truck.

[¶6]   Trooper Kirlin arrived shortly after and parked behind the truck.  After briefly interacting with Trooper Hobbs, Ms. Nadeau, and Mr. Simmons, he retrieved his certified drug-detection dog from his patrol car and conducted a free air sniff of the exterior of the truck.  The dog alerted on the seam between the cab and the bed.  On searching the truck, officers found approximately one-quarter pound of methamphetamine, a glass pipe with methamphetamine residue, two scales, another pipe, a straw with methamphetamine residue, and a small amount of marijuana.

---

[1] The truck was registered to Mr. Simmons' father.  Special Agent Eric Ford had previously observed Mr. Simmons driving it.

1

[¶7]    The State charged Mr. Simmons with possession of methamphetamine, possession with intent to deliver methamphetamine, conspiracy to deliver methamphetamine, and possession of marijuana (third or subsequent offense).  He pleaded not guilty to those offenses.  Before trial, Mr. Simmons moved to suppress the evidence recovered from his truck.  He argued, in relevant part, that he "was stopped for a crack on his windshield which did not obstruct the view of the road."  He noted the prosecutor had not released "dash cam video or body cam video from the stop to dispel the reasonableness of this search."

[¶8]    The court denied Mr. Simmons' motion after an evidentiary hearing at which Agent Ford, Trooper Hobbs, and Trooper Kirlin testified.   The prosecutor introduced a photograph of the cracked windshield as well as Trooper Hobbs' dash cam video.  In sum, the court decided:

> Since Trooper Hobbs witnessed a traffic violation, there was proper justification for initiating a traffic stop.  Further, Trooper Kirlin deployed his drug [detection] canine while Trooper Hobbs completed the traffic stop and his actions in no way extended the duration of the traffic stop, nor did his questions of Mr. Simmons exceed the scope of the traffic stop.  As such, [Mr. Simmons'] Fourth Amendment and Wyoming Constitutional rights were not violated.

We address the evidence and the court's findings in more detail below.

[¶9]    At trial, the State dismissed the marijuana charge and the jury found Mr. Simmons guilty of the three methamphetamine charges.  The court imposed concurrent sentences of 12 to 16 years for (1) possession and possession with intent to deliver, which merged for sentencing purposes, and (2) conspiracy to deliver.  This appeal followed.

### STANDARD OF REVIEW

[¶10]  In reviewing the district court's denial of Mr. Simmons' motion to suppress, we view "the evidence in the light most favorable to the district court's determination and defer[] to the district court's factual findings unless they are clearly erroneous." *Robinson v. State*, 2019 WY 125, ¶ 20, 454 P.3d 149, 156 (Wyo. 2019) (quoting *Jennings v. State*, 2016 WY 69, ¶ 8, 375 P.3d 788, 790 (Wyo. 2016)).  We defer to the district court's factual findings because it had "the opportunity to hear the evidence, assess witness credibility, and draw the necessary inferences, deductions, and conclusions[.]"  *Id.* (quoting *Flood v. State*, 2007 WY 167, ¶ 10, 169 P.3d 538, 542 (Wyo. 2007)).  "Whether an unreasonable search or seizure occurred in violation of constitutional rights presents a question of law which we review *de novo*." *Fertig v. State*, 2006 WY 148, ¶ 8, 146 P.3d 492, 495 (Wyo. 2006) (citation omitted); *see also Lovato v. State*, 2010 WY 38, ¶ 22, 228 P.3d 55, 60 (Wyo. 2010) (reviewing de novo whether reasonable suspicion supported the initial stop).

*DISCUSSION*

[¶11]   The Fourth Amendment to the United States Constitution protects Mr. Simmons from unreasonable searches and seizures.  There are "three tiers of interaction between law enforcement and citizens: consensual encounter[s], investigatory detention[s] and arrest[s]." *Robinson*, ¶ 21, 454 P.3d at 156 (citations omitted).  Mr. Simmons' interaction with troopers began as a traffic stop, which is an investigatory detention. *Id.* (citation omitted).

[¶12]   The only issue on appeal is whether the initial stop was justified.

> To justify a traffic stop, the trooper must have "reasonable suspicion—that is, a particularized and objective basis" to suspect the motorist is violating the law.  The trooper's conduct is judged by "'an objective standard which takes into account the totality of the circumstances.'"   "[W]hile the test is objective, the [trooper]'s training, experience, and expertise are to be considered as part of the totality of the circumstances."

*Id.* ¶ 22, 454 P.3d at 156 (citations omitted).   "Provided the [trooper] has reasonable suspicion to initiate a stop, '[the trooper's] subjective intent to search for drugs does not invalidate an otherwise lawful traffic stop.'" *Pier v. State*, 2019 WY 3, ¶ 18, 432 P.3d 890, 896 (Wyo. 2019) (quoting *Fertig*, ¶ 14, 146 P.3d at 496); *see also Lovato*, ¶ 14, 228 P.3d at 28.

[¶13]   The district court concluded the stop was justified because Trooper Hobbs observed a violation of Wyo. Stat. Ann. § 31-5-955(a).  Section 31-5-955(a) (LexisNexis 2019) states in relevant part: "No person shall drive any motor vehicle with any . . . crack within the front windshield . . . which materially obstructs, obscures or impairs the driver's clear view of the highway[.]"  The court reasoned:

> Both Trooper Hobbs and Trooper Kirlin testified that they observed a cracked windshield on the Tacoma.  They saw light from the sun glint off the windshield.  Also, Trooper Hobbs testified that the window had multiple cracks running through it including one right down the middle of the windshield and such a crack could create impairment due to sun reflection, distortion, and damage to windshield wipers.  The photograph of the windshield clearly shows the cracked windshield consistent with the Troopers' testimony.  Further, Ms. Nadeau told Trooper Hobbs that the reason for the trip she and Mr. Simmons took to Laramie was to try to replace the cracked windshield.

3

Despite the stop of the Tacoma being pretextual due to information provided by Agent Ford, Trooper Hobbs based the initial traffic stop upon a personally witnessed violation of the law. Thus, [Mr. Simmons'] rights under both the Wyoming Constitution and the United States Constitution were not violated by Trooper Hobb[s'] initial stop.

[¶14] *Lovato v. State* supports the district court's ruling. There we affirmed denial of a motion to suppress challenging a traffic stop for two violations—a cracked windshield and a dark-tinted license plate cover. *Lovato*, ¶¶ 13–22, 228 P.3d at 58–60. At the motion to suppress hearing, Trooper Cheser testified he "could see the sunlight glinting off of a crack on the windshield on the upper left side of the windshield," suggesting a possible violation of Wyo. Stat. Ann. § 31-5-955(a). *Id.* ¶ 15, 228 P.3d at 59. Mr. Lovato argued to the district court and again on appeal that testimony about the crack's location and size was inconsistent. *Id.* ¶ 16, 228 P.3d at 59. Neither the prosecution nor the defense offered a photograph or other evidence to resolve the inconsistencies. *Id.* We deferred to the district court's finding that "Trooper Cheser observed a crack in the [] sedan's windshield[,]" noting it was uncontroverted the crack was there and visible, and we were not convinced the district court made a mistake. *Id.* ¶ 17, 228 P.3d at 59. We concluded Trooper Cheser's observations of the windshield crack and license plate "were sufficient to provide [him] with the reasonable suspicion necessary to stop Mr. Lovato." *Id.* ¶ 22, 228 P.3d at 60.

[¶15] Mr. Simmons attempts to distinguish *Lovato* on two grounds: (1) "there was also an unreadable license plate" and (2) the trooper's observations "did not stretch credulity." We address these grounds in turn.

[¶16] That the trooper in *Lovato* observed Mr. Lovato driving his sedan in violation of two statutes, not one, is not a meaningful distinction. Either violation standing alone would have supplied the necessary justification to stop Mr. Lovato under the circumstances. *See Allgier v. State*, 2015 WY 137, ¶ 20, 358 P.3d 1271, 1277–78 (Wyo. 2015) ("Because we have determined that the initial stop was permissible based upon the reasonable suspicion that there was a violation of Wyo. Stat. Ann. § 31-5-210(a), we need not reach the question of whether Trooper Tegdesth had a reasonable suspicion that the jeep was in violation of Wyo. Stat. Ann. § 31-5-955(a)."). Similarly, one traffic violation was enough here.

[¶17] Mr. Simmons' assertion that the troopers' observations "stretch credulity" impugns the district court's factual findings. As noted above, we defer to the district court's factual findings unless they are clearly erroneous. *Robinson*, ¶ 20, 454 P.3d at 156. "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Dixon v. State*, 2019 WY 37, ¶ 24, 438 P.3d 216, 228 (Wyo. 2019) (quoting *King v. State*, 2017 WY 129, ¶ 9, 403 P.3d 1070, 1073 (Wyo. 2017)). We are left with no such conviction.

[¶18] At the motion to suppress hearing, Trooper Hobbs testified he was not aware of the cracked windshield before the stop. When the truck came over the hill, he "noticed a reflection on the windshield indicating a cracked windshield[.]" Asked to describe the reflection, he responded that a cracked windshield not only causes "bright sunlight glare . . . but it will refract and . . . go in an odd direction and be very sharp and crisp." The crack appeared to be in the center of the windshield. The weather at the time was cloudy to the west and sunny to the east; vehicles were traveling about 75 miles per hour.

[¶19] Trooper Hobbs also explained why the windshield concerned him. Based on his experience driving with a cracked windshield, a crack could "create blind spots with the reflection of the sun" and shift a driver's perception of where objects are located. A crack could also damage the windshield wipers, affecting a driver's "ability to look out and have a safe field of view" in inclement weather. Trooper Hobbs believed the windshield crack was obstructing the driver's view, noting his belief that there were two cracks—one vertical and one horizontal—creating "more area for blind spots or possible obstruction of the driver's view."

[¶20] Trooper Kirlin's testimony about the windshield corroborated Trooper Hobbs' testimony. He "witnessed a cracked windshield as the vehicle passed [their] stationary location" and, based on his observation, he too believed it was obstructing the driver's view. Trooper Hobbs confirmed the cracks visible in a photograph of the windshield, which Agent Ford took after the traffic stop, were those he saw as the truck approached him.

[¶21] The evidence before the district court was thus similar to, if not stronger than, the evidence before the district court in *Lovato*. *Cf.* ¶ 16, 228 P.3d at 59. As in *Lovato*, we conclude the district court's factual findings are not clearly erroneous. Deferring to those findings, we hold Trooper Hobbs had reasonable suspicion to stop the truck's driver for driving with a "crack within the front windshield . . . which materially obstructs, obscures or impairs the driver's clear view of the highway[.]" Wyo. Stat. Ann. § 31-5-955(a). Contrary to Mr. Simmons suggestion, Trooper Hobbs did not need to "determine . . . that the driver's view was impaired." He needed "'reasonable suspicion—that is, a particularized and objective basis' to suspect" the driver's view was obstructed, obscured, or impaired, *Robinson*, ¶ 22, 454 P.3d at 156, and he had as much under the circumstances of this case.

[¶22] Affirmed.